# CHARLESTON

## Hale v. Hale.

Submitted June 7, 1907.    Decided November 19, 1907.

| 62 | 609 |
| f64 | 277 |
| f65 | 130 |
| f65 | 502 |
| 65 | 579 |

1. DEEDS—*Cancellation—Fraud—Negligence.*

    Mere failure to read a deed or other instrument before signing it, by a person who is able to read and understand it, being only negligence of the injured party, not importing fraudulent conduct on the part of him who obtains the benefit of it, is not ground for setting the instrument aside. Equity never relieves a party from his own deliberate acts, done with full knowledge of the facts. (p. 620.)

2. CANCELLATION OF INSTRUMENTS—*Fraud—Negligence.*

    But failure to read an instrument, before signing it, does not bar relief therefrom in equity, on the ground of negligence or estoppel, when the circumstances attending the transaction were such as to lead the party to believe he was signing a paper of entirely different character. (p. 631.)
    39

3. DEEDS—*Validity—Fraud.*

A husband, having a contingent estate by the courtesy in his wife's lands, who, for several years, has been in the habit of executing deeds, prepared by his son, conveying small town lots out of the same, without reading them, on the representation of the son as to what was conveyed and to whom, in each case, may set aside, as having been fraudulently procured, a deed, so prepared, conveying to the son all of the wife's real estate, in consideration of one dollar and natural love and affection, and executed by him, without reading it, on the son's representation that it conveys a mere town lot. (p. 623.)

4. CANCELLATION OF INSTRUMENTS—*Laches.*

In such case, delay in suing for a period of less than a year, after the discovery of the fraud, explained by showing difficulty in securing the services of counsel, and the impression that a suit to set aside the deed could not be maintained until after the death of the wife, does not bar relief on the ground of laches. (p. 611.)

5. SAME—*Evidence.*

When, in a suit by the grantor in a deed to set it aside for fraud in the procurement thereof, the oral evidence of the parties, relating directly to the execution thereof is flatly contradictory and wholly irreconcilable, the circumstances bearing on the issue must be allowed unusual prominence and effect, and their controlling force depends more upon their character and power to create mental impression than their number and variety. (p, 615.)

Appeal from Circuit Court, Lewis County.

Bill by P. M. Hale against Thomas W. Hale. Decree for plaintiff, and defendant appeals.

*Affirmed.*

W. W. BRANNON and EDWARD A. BRANNON, for appellant.
W. G. BENNETT and THOMAS R. HORNOR, for appellee.

POFFENBARGER, JUDGE:

The circuit court of Lewis county having set aside at the instance of P. M. Hale, as fraudulent, a certain deed, executed by Eliza Hale and said P. M. Hale, her husband, conveying all the real estate of the former to Thomas W. Hale, and thereby relinquishing the contingent life estate by the curtesy of the latter therein, said Thomas W. Hale has appealed from the decree.

The deed in question was executed on the 4th day of August, 1902, and the bill to set it aside was filed at rules

held on the first Monday in January, 1905. The lapse of time, thus shown on the face of the bill, about two years and four months, intervening between the date of the deed and the institution of the suit, was urged upon the demurrer as *laches*, barring the suit; and the overruling of the demurrer is assigned here as error. The bill, however, avers ignorance of the contents of the deed on the part of the plaintiff for a period of nearly two years after the execution and recordation thereof, in addition to the fraudulent procurement of the same. It also avers, by way of excuse for the further delay of about four months, plaintiff's inability to obtain the services of the counsel he desired to employ for the purpose of prosecuting the suit. It says one man whom he wished to employ was confined to his bed with an attack of typhoid fever, another not in condition to act until within a few days before the institution of the suit, and another a candidate for office, who, had he been elected, could not have acted. He had also been advised by counsel, that, as his interest in the estate was contingent only, it being an estate by the curtesy, dependent upon his surviving his wife, whose property the subject matter of the deed was, he could not maintain a suit until after her death. It also alleges that plaintiff's possession of the premises had not been disturbed. We think these averments of the bill sufficiently explain the delay and excuse the same. On the demurrer, the averments of the bill must be taken as true. So regarding them, the plaintiff did not know for nearly two years, that he had executed any deed which conveyed the property in question, and, after the expiration of said period, and the discovery of the fraud, he instituted his suit within a reasonable time, a period of only a few months. While ignorance of law does not, as a rule, excuse wrongful action or failure to act, assuming that plaintiff was wrongfully informed respecting his ability to institute and maintain a suit prior to the death of his wife, the erroneous information and advice so given bears upon the question of the intent and purpose of the delay, showing absence of intention to relinquish or abandon the right or interest set up by the bill. Under some circumstances, ignorance of law and erroneous advice by counsel, might not be sufficient to excuse delay; but what constitutes *laches* almost invariably

depends upon the peculiar circumstances of the case. *Jackson* v. *King*, 12 Grat. 499, 510, *et seq; Bell* v. *Woods*, 94 Va. 677; 18 Am. & Eng. Ency. Law 119. Often the principle of estoppel enters into, and is operative in, the case. There, it is apprehended, ignorance of law and erroneous advice would not avail the plaintiff. The rights of other persons, to whom fraud or mistake is not imputable, have intervened. Under such circumstances, the lapse of time ought not to be great. Familiar illustrations of the application of this principle are found in the decisions of all courts. If a man stand by and see property sold in which he has an interest, disclaiming any interest therein, with the intention that the purchaser shall rely upon the statement and be so influenced to part with his money and take the property, he is estopped thereafter to assert any interest in it. *Despard* v. *Despard*, 53 W. Va. 443; *N. & W. Ry. Co.* v. *Perdue*, 40 W. Va. 442. This is not *laches*, it is true, and though it is what is known in law as estoppel, it enters into the doctrine of *laches*, reducing the period of time which would otherwise be necessary to bar the right or remedy. Even when the rights of third parties have not intervened, circumstances and conditions often become so changed as to make it inequitable and unjust to allow the plaintiff to avail himself of rights and remedies fully known to him which he has neglected,to assert. Thus, if one who has, by mistake or fraud, obtained property of which he could be deprived by the establishment of the fraud or mistake, be permitted to hold it for a long period of time, until it has greatly increased in value, or he has made expensive improvements upon it, these circumstances will shorten the period of time necessary to constitute *laches*. *Gish* v. *Jamison*, 96 Va. 312; *Connelly* v. *Rue*, 148 Ill. 207; *Horr* v. *French*, 99 Ia. 73; 18 Am. & Eng. Ency. Law 102. So, if an injured party delay proceedings until the alleged wrong-doer is placed at a great disadvantage by reason of the death of witnesses. Again, if the circumstances are such as to show intention on the part of the complainant, to reserve to himself a right of election to affirm or repudiate a contract, according to the event thereof, and this delay is attributable to nothing other than a desire to await the event and repudiate it, if it turn out to be a bad contract, and claim the benefit of it, if it turn out

to be a good one, equity will not lend him any aid. *Booton* v. *Scheffer*, 21 Grat. 474, 497; *Anthony* v. *Leftwich*, 3 Rand. 238; *Gish's Ex.* v. *Jamison*, 99 Va. 312; *Willard* v. *Tayloe*, 8 Wall. 557. A court of equity is a court of conscience and will not tolerate unfairness, inequitable conduct or corruption in a complainant, however strong and clear his equitable right against the other party. He must come to her door with clean hands, respecting the matter in controversy. There is a vast difference, too, between the status of one who has received nothing for that with which he has parted, and as to whom the transaction was wholly fraudulent, and that of a man who has made a contract by which he has not only parted with something, but received something in exchange, and in which the fraud operated only partially, reaching the substance to be sure, but not constituting the basis of the entire transaction. In the latter class of cases, the principle of election operates more widely. There is a voidable contract, not one wholly and absolutely void, while in the former, if the transaction be not absolutely void, courts see less reason for the application of the doctrine of election. When the fraud is a mere incident of the contract, equity gives a right of rescission of which the party must avail himself promptly. On the other hand, the want of any consideration or advantage, enuring to the injured party, is a circumstance arguing strongly against the view of a fast and loose policy on his part; and, in such case, if the rights of no third parties have intervened, and the lapse of time has been comparatively short, and the defendant has not been put at any serious disadvantage in respect to his evidence, the element of estoppel does not enter into the case, and it becomes largely a question as to whether the complainant intended to abandon his right, and led the defendant to believe he had done so. In the case of a mere fraud, the question is one of pure waiver or abandonment of a right, not of election to stand by a voidable contract. It must be apparent from the great variety of circumstances which the courts must consider in determining what amounts to *laches*, in the numerous cases decided, that no general rule respecting the lapse of time, has been, or could have been, fixed. Some complainants are held to have been barred by the lapse of only a few months. *Seiveking* v. *Litzler*, 31 Ind. 13. Others

have been allowed to sue after the flight of many years, *Aylett* v. *King*, 11 Leigh 486, *Jameson* v. *Rixey*, 94 Va. 342, and still others have been admitted and rejected, practically without reference to time between these two extremes, according to the peculiar circumstances of each case. Here, according to the allegations of the bill, the plaintiff received nothing for the right given up by the deed and as to him it was wholly and absolutely fraudulent. No third parties have acquired rights in any considerable portion of the property, and, in so far as they have, the property has been severed and cut off by conveyances and as to it the plaintiff asks no relief. Nor does it appear that the defendant is placed at any disadvantage in respect to his evidence. All the witnesses to the alleged agreement, relating specifically to this transaction, himself and his wife, are still living and their testimony has been taken. His mother, one of the grantors in the deeds is dead, it is true, but it is not claimed that the conversation took place in her presence. On the contrary, it clearly appears to have taken place elsewhere. Hence, we do not perceive any injury or prejudice resulting to the defendant from the slight delay complained of, and nothing in the case calls for the application of any rule of *laches.* This being true, it is wholly immaterial that the complainant deferred action on the advice of counsel, or from ignorance of law. In the absence of any circumstance, rendering the delay inexcusable, such advice, though erroneous, or ignorance, if there was any, would strengthen the position of the injured party. *Berry* v. *Wildman,* 40 W. Va. 41; *Cramer* v. *McSwords*, 24 W. Va. 595. In the case last mentioned, this Court held as follows: "While ignorance of law will not prevent the operation of the statute of limitations, the rule is different in equity, a court of conscience; in such court moral as well as legal grounds may be considered, and a satisfactory moral excuse may be entertained, although it resulted from ignorance of law." It may be that the delay has been long enough to raise a presumption of abandonment or acquiescence, and so necessitate averment of matter excusing the delay or rebutting the presumption; but the circumstances here disclosed, satisfy the court that the delay was due to something other than an acquiescence in the matter complained of, or a desire to relin-

quish the right of repudiation.   *Berry* v.  *Wildman*, 40 W.
Va. 36; *James River &c. Co.* v. *Littlejohn*, 18. Grat. 53;
*Mayo* v. *Carrington*, 19 Grat. 74; *Irving* v. *Greever*, 32
Grat. 411; *Baker* v. *Morris*, 10 Leigh 284; *Com.* v. *Lilly*, 1
Leigh. 525.

Our conclusion, based upon the principles and facts stated
in the bill, is, that the demurrer was properly overruled; and.
it will further appear  from  the facts, developed by  the an-
swer  and evidence  on  the  final  hearing,  that  they do not.
bring the case within the principles governing *laches*, where-
fore the decree cannot be reversed on that ground, either for
defect in the bill or on the merits, and further  discussion of
this phase of the case will be unnecessary.

The inquiry as to  whether the deed was fraudulently pro-
cured involves the consideration of  many  facts and circum-
stances, not seriously controverted, and the evidence relating
to many others as to which there is controversy; and the case
involves  practically  the  history  of  the  plaintiff  and  his
family.   Prior to 1858,  he  was a  widower  having  certain
children.   In  the  year  1858,  he  married  Eliza  Butcher,  a
daughter of  Jacob Butcher,  and  by her there was  born  to.
him one child, a son, the defendant, Thomas W. Hale, about.
the year 1859.   In July, 1876,  Jacob Butcher died, leaving
as his heirs Eliza Hale, wife of  the plaintiff, and  two grand
sons, E. M. Vandervort and J.  S.  Vandervort, children  of
his daughter Nancy, who had  married  James  G.  Vander-
vort and died prior to the date of  the  death  of  her father.
Jacob Butcher owned a considerable estate  and  died  intes-
tate.   Just how much personal estate he left in  the  form  of
money,  notes  and bonds is not very clearly shown, nor does
it appear how  much other personal property he had; but
he seems to have  had between two  and three thousand dol-
lars in money and securities.   On his decease, the wife of
the plaintiff, Eliza Hale, was  appointed administratrix, and
the estate was not settled up for a period of about five years.
On the settlement,  it seems  that Mrs. Hale was indebted to.
the  Vandervort  grand. children  in  a  small  sum  which
she paid out of money derived from the sale of  some of her
land.   As to this personal  estate,  there is great controversy
and conflict between the plaintiff and defendant.   The former
denied that he had ever received  or used  any money from

his wife's estate, other than that which he expended on her property in the erection of buildings, and the latter charges that he used or attempted to use in his own business practically all of her personal estate. In fact he charges that his father, by improper and covetous interference with his wife's portion of the Butcher estate, delayed the settlement thereof, which could have been made within a year, there being no indebtedness to pay, for a period of about five years. At the time of the death of the grand father, the defendant was about sixteen years old, and he claims that he then, and from that time forward, resisted his father's interference with his mother's estate. He, together with one of the Vandervort boys, gathered up the papers, notes and securities of the grand father and deposited them in a certain bank for safe-keeping, for which act his father punished him severely. On the contrary, the plaintiff says he punished his son not for taking the papers, but for his disobedience in doing so, he having forbidden his meddling or interfering with them on account of his youth and inexperience and his permitting the other boy to handle them. From this time forward, as appears from the evidence of both parties there was an estrangement between father and son, and, at times, the deepest bitterness and hatred existed between them. Disinterested witnesses testify to expressions of mutual contempt, bitterness and hatred of each other, and the son is charged with having applied to his father, not only bitter and vituperative, but profane epithets. Notwithstanding all this, they continued to reside together in the house built by the plaintiff on his wife's farm, and a good many years ago the son married, and brought his wife there, where all continued to live until after the date of the deed in question and the death of Mrs. Hale, wife of the plaintiff and mother of the defendant.

The plaintiff had been an active business man all his life. For some years prior to the war, he had been engaged in the manufacture of hats, boots and shoes and clothing, and in the manufacture of brick and the construction of buildings. During the war he was engaged, among other things, in the mercantile business, and claims that, at that time, he had accumulated about $28,000.00, of practically all of which he was deprived by the raids of three successive armies into the

town of Weston. He attempted to retrieve his fortunes by engaging more extensively in the business of contracting and erecting buildings. He claims to have been successful and made money in this way until about the year 1887, when he took a contract, under disadvantageous conditions, for the building of a court house and jail in Weston in which he failed. Though he claims not to have been greatly indebted at this time, it is apparent from his testimony, as well as from that of the defendant, that he was thereby reduced to very straitened circumstances. He did not make an assignment, but practically all of his property was swept away without satisfying all his debts, but he nevertheless seems to have continued in business as a butcher and to have carried on a little business in fresh meats, and claims that he now owes practically nothing. He says himself that, at about this time, the taxes on his wife's property as well as his own were in arrears, and charges that his son caused the officers to sacrifice, for a mere pittance, practically all the property he had, and so cripple him in his business and prevent the payment of a portion of his debts. The defendant admits the sale of a portion of his father's property for this purpose, but denies that it was sacrificed and also that it was of the extent and value claimed by the plaintiff. By the admission of the plaintiff, as well as the claim of the defendant, the former had little to do with his wife's property from and after the date of the misfortune that overtook him, in consequence of his having contracted to build the court house and jail. Her business was conducted by the defendant with whom she advised and upon whose advice she acted. She had obtained from her father's estate a tract of about ninety acres of land which, by reason of its proximity to the town of Weston, has become very valuable, and is now within the corporate limits of the town. Plaintiff claims that it is now worth about $75,000.00, and that the annual income from it would amount to $2,500.00 or $3,000.00. But for this deed, he would now have a life estate by the curtesy in all of said property that has not been sold. Some years ago, Mrs. Hale had a portion of the property, if not all of it, laid off into town lots and had, prior to the date of the deed in question, conveyed a great many of these lots to numerous persons. The defendant, having entered upon the pro-

fession of law, was entrusted by her with the preparation of all deeds and contracts, relating to the leasing and sale of these lots. The plaintiff of course joined in all the deeds and contracts, but the defendant says he did so reluctantly and was contrary about it, wherefore it became necessary for him, in each instance, to go to his father in advance of the preparation of the deed or contract, and explain to him the proposed sale or lease and obtain his agreement to join his wife in the execution thereof. The plaintiff, on the other hand, denies his unwillingness at any time to execute such deeds, and says it was the practice for his son to prepare them and bring them to him in his meat shop or about the stable or wherever he happened to be, and obtain his signature upon the mere statement of the son as to what was conveyed and to whom. He says it was not his practice to read these deeds, either at the time of signing them or at the time of acknowledgment. The son swears that the father always read them or heard them read, either by him or the officer before whom they were acknowledged, and sometimes by both. On the 4th day of August, 1902, two deeds were executed by the plaintiff and his wife, by one of which a small lot was conveyed to Hale Sherrard, a grand son of the plaintiff, a child of a daughter by his first wife, for the recited consideration of six hundred dollars, which it is admitted was not paid nor intended to be paid. By the other deed, all the residue of the property of Mrs. Hale was conveyed to the defendant, Thomas W. Hale, her son. Plaintiff says that defendant obtained his signature to, and the acknowledgment of, this last deed, by which, if valid, he relinquished his contingent life estate in all of his wife's property, by representing that it was a deed conveying a small lot to somebody. He denies that he read either of the deeds and says the defendant brought them to him outside of his place of business away from his room, together with pen and ink and so obtained his signature, and that the officer who took his acknowledgment did not read either of them to him, and that about a year and a half afterwards he learned from his grand son, Hale Sherrard, the report or rumor that such a deed was on record in the clerk's office of the county court of the county, to which place he immediately went and found the deed. He denies that the matter of such conveyance was ever men-

tioned or intimated to him by the defendant or any one else.
The defendant, however, claims this conveyance was a matter
of deliberate and solemn agreement entered into before the
deed was executed, and that his father's assent was obtained
by the agreement of his mother to convey to Hale Sherrard,
a grand son of the father, but not related to Mrs. Hale by
blood, a small lot, of which mention has been made.   This
grand son, a young married man at the time, was a favorite
of the plaintiff, who had gone to Pennsylvania and there
married and was not doing well, and had been brought by
the plaintiff to Weston in the hope of bettering his condition
by taking him into the meat business as a partner and pro-
viding him a home.   Plaintiff admits that he applied to his
wife for the conveyance of this lot, and says she willingly as-
sented, saying it was no more than right and just, inasmuch
as she had already conveyed to Hale Sherrard's sister an-
other lot of like kind and value.   He denies that she required
of him, in consideration of this conveyance to his grand son,
the relinquishment of his interest in the balance of her es-
tate.   The defendant claims the negotiations were conducted
through him, that it was arranged that he was to see his
mother about it and communicate to the plaintiff, at the room
of the defendant in the residence of the parties on the morn-
ing of Sunday, August 3, 1902, his mother's decision re-
specting the matter, and that he had pre-arranged with his
wife, Minnie E. Hale, that she should be present and hear
the conversation.   Both he and his wife swear that the plain-
tiff appeared on that Sunday morning, and was informed
that Mrs. Hale would convey the lot to Hale Sherrard, if the
plaintiff would join her in the conveyance of the residue of
her property to the defendant, the plaintiff, however, to
keep his room in the residence and remain there for the bal-
ance of his lifetime as he had previously kept and used it.
They say his response to this proposition was "All right,
that suits me first rate, for I am willing to do anything at
all to relieve Haley in his distressed condition."   All of this
is denied specifically and absolutely by the plaintiff.   Cer-
tain circumstances are relied upon as confirming the testi-
mony of the plaintiff and condemning that of the defendant.
One of these is the improbability that the complainant, a
man well advanced in years, but strong and hearty, knowing

his wife who had been for years an invalid and was then in a very enfeebled condition, would very probably die in a short time,' leaving to him a life estate in this valuable property, for his support in his declining years, would thus deliberately give away to a son whom he detested and had despised for years, his interest in the property. The advantage enuring to the favorite grand son is set up in opposition to this argument, but the inadequacy of the inducement is replied, the value of the lot not amounting to more in value than one month's rental value of the property parted with. A year or more after the date of the deed, the plaintiff sued one Dr. Nichol for the rent of a stable which stood on the wife's premises near the house, and, to meet the objection that the property for the rental of which the action had been brought, was that of Mrs. Hale and not of the plaintiff, he obtained from his wife a written instrument, declaring the stable to be his, which instrument was read in the presence of the defendant, who was participating in the trial, and who did not then mention the deed of August 4, 1902, or intimate that the title of the property was in him, and was then filed as evidence in the case and judgment for the rent was recovered. The clerk of the county court says Hale came and asked permission to see if there was a deed on record, such as the one in controversy, stating that he had heard there was, and that he showed it to him. These are practically all of the principal facts and circumstances that it is necessary to consider in reviewing the action of the trial court. Of course, there is a mass of conflicting testimony and a great many additional facts of minor importance which it would be impossible to set out here in detail.

Considerable argument against the decree is predicated upon the view that a grantor who has signed the deed, without having read it, is guilty of negligence so gross as to estop him from setting up his ignorance of its contents in avoidance thereof. *Ferrell* v. *Ferrell*, 53 W. Va. 515; *Fulton* v. *Messenger*, 61 W. Va. 477, (56 S. E. 830). Mere ignorance of the contents of an instrument, without more, would not suffice to open the doors of a court of equity, or sustain or defeat an action at law. It would amount merely to a complaint against one's self. It imputes no misconduct or wrong

to any one else.  If a man sees fit to give away his money or property, or throw it away or abandon it to the world at large, both law and equity accord him the privilege of so doing.  The wreckless or negligent execution of a deed or other paper, without knowledge of its contents, is an act of a similar kind.  The court cannot, in such case, be asked to lay its hand upon any person and compel him to right a wrong done by him, for there is no wrongdoer.  The acceptance of the benefit of a wreckless act is no wrong in the acceptor.  Courts often grant men relief from their mistakes, but never from their deliberate acts, done with full knowledge of the facts.

But to say a man can never avoid his deed, merely because he signed and delivered it, without having read it, would be greatly variant from the law.  Kerr on Fraud & Mistake, 388, 389; *Boyce* v. *Grundy*, 3 Pet. 210; *Holbrook* v. *Burt*, 22 Pick. 346; *Curlett* v. *Newman*, 30 W. Va. 182. Circumstances often justify such action, even when there is no fiduciary relationship between the parties and they stand on an equal footing.  There may be no such relation and yet confidence reposed on the one side and abused on the other, as in the case of a verbal agreement, which one party relies upon the other to reduce to writing.  If the latter takes upon himself that duty and, in the pretended performance thereof, writes an entirely different agreement and obtains the other's signature thereto, representing that it is the verbal agreement reduced to writing, either by expressly saying it is, or by representing it as such, the failure to read it constitutes no estoppel.  *Medley* v. *Ins. Co.*, 55 W. Va. 342, (syl. 3); *Shepherd* v. *Henderson*, 3 Grat. 367; *Pulaski Iron Co.* v. *Palmer*, 89 Va. 384.  Though this illustration does not, in its circumstances, correspond with the case in hand, it declares the principle upon which the bill is founded.  It says that, in previously signing deeds, upon the mere representation as to what was thereby conveyed, as a matter of convenience, in effecting the sale of numerous lots, deeds for which had been prepared by the defendant, a relationship and condition or method of transacting business had been established which justified the plaintiff in assuming that the defendant was presenting to him for signature a deed conveying only a lot or small por-

tion of his wife's property, as he had been in the habit of doing for some years, and in relying upon the express representation made at the time that the deed in question was such a deed. No rule, prescribing all the conditions under which courts may set aside deeds for fraud in the procurement thereof, can be formulated. The conditions and circumstances attending the execution of the millions of such instruments in use, are so different that no one rule can take them all in. Fraud assumes so many different hues and forms that courts are compelled to content themselves with comparatively a few general rules for its discovery and defeat, and allow the facts and circumstances peculiar. to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence. Generally, however, this latitude affects the probative force of the circumstances rather than the relationship of the parties. The parties always stand either at arm's length on an equal footing, or in some sort of confidential relation, and that need not be, and is not, always a trust or fiduciary relation in the full sense of the term.

. That the defendant here did not sustain a trust relation to the plaintiff, such as prevented his taking from the latter a binding and indefeasible conveyance, is asserted by *Curlett* v. *Newman*, 30 W. Va. 182. If he had, the deed would be voidable at the option of the grantor. *Lane* v. *Black*, 21 W. Va. 617. Though he was not an agent having power and authority to convey the land, he was entrusted with the preparation of deeds, for both the plaintiff and his wife, and the case would not fall within the rule declared by *Lane* v. *Black*, he assumed a duty, responsibility and relationship, which not only justified, but necessitated reliance to a very considerable extent upon his honesty, fairness and good faith toward the plaintiff. It is, at least, a circumstance sufficient to repel the charge of negligence, if it appear that the deed in question was not contemplated or intended, for it afforded an opportunity to obtain such a deed by abuse of the confidence reposed.

But if it be conceded that there was no agency, in any sense, and admitted on the other hand that the facts are as they appear from the plaintiff's bill and evidence, they put the defendant in a position which made it his duty, in

fairness and justice to the plaintiff, to disclose to him the nature and contents of this deed. The latter had the right to rely upon the course and method of dealing, with reference to this land, which had been established between them and observed for several years. There is a vast difference between presenting a deed, conveying a single town lot or several town lots out of a large tract of land, for the relinquishment of a contingent estate therein, and a deed calling for the relinquishment of such estate in the entire tract of ninety acres. The nature and extent of the previous transactions, most of which were conveyances to strangers and of small town lots, were such in their very nature and so numerous as necessarily to lead the plaintiff to expect and look for deeds of that character and no other. He knew his wife was disposing of small lots, but still retaining the bulk of her estate, and there was nothing in this to indicate intention to dispose of all of it by a single conveyance, nor to give it away instead of selling it. Under such conditions, it was inequitable and unjust, and in the nature of a trick or device, to present to him for execution a deed conveying to the man who prepared it, and who had prepared all the others, the entire tract of land, as a gift.

In view of the great conflict in the evidence, and our inability to see that the finding of the court below is contrary to the weight and preponderance thereof, it must be allowed to stand. It may well be regarded as proven that the plaintiff took very little interest in, and manifested very little concern about, the conveyances of the numerous small lots in which he joined prior to the execution of the deed in question, wherefore it is quite probable that he was not in the habit of reading the deeds and did, as he states, execute them wherever he happened to be found, without reading them and on the representation of the defendant as to their contents. He appears to have been a very active and industrious man, and to have devoted almost every hour of every day to his business, just such a man as would likely not have given himself much concern about a matter in which he had no interest, or his interest in which he had determined to release. His wife had a considerable estate, from the management and control of which she had excluded him,

and a portion of which she could convert into personal property by advantageous sales. That was her business, not his. All he was called upon to determine was whether he would join her in the deeds. He got none of the money, except possibly a few small amounts, given or loaned to him by the defendant, who says his mother gave him all or about all of the purchase money. Even if he had supposed his wife was merely changing the character of her holdings from real estate to personal property, and not shifting it into the hands of the son, it was still her business. He was not entitled to receive, at that time, a dollar of 'the purchase money. Why should he have exercised great care, unless he feared fraud and imposition on the part of the wife or son or both? He was neither asked nor permitted to do more than execute the deeds. All the balance was entrusted to the son, and how natural it is, when transactions are effected by the separate actions of several persons, for each to assume that the others have performed their parts properly, and stop with the performance of his own. Besides, the defendant himself says his father was always informed as to what the deed would convey before it was prepared, a circumstance, if true, strongly arguing that it was not the habit of the plaintiff to read the deeds. Are we to assume that he feared or had any reason to fear that both his wife and son would defraud him or that the son would attempt to defraud both? It is also highly improbable that, in view of the approaching death of his wife, she being feeble at the time, and having been an invalid for many years, he would relinquish his life estate in her property upon no inducement other than the conveyance of a small town lot to a grand son. It is urged that these two deeds must be read together as constituting a single contract and the one regarded as the consideration for the other. They are not such in any legal sense. A deed made to Sherrard Hale was not a consideration moving to P. M. Hale for the conveyance made to T. W. Hale. It could have been nothing more than a fact or circumstance which might have induced him to execute the other deed. In so far as it was valuable, it went to a third party, not to him.

No time need be consumed in the settlement of this question, for the argument assumes the truth of the defendant's

evidence and the falsehood of that of the plaintiff.   The lat-
ter's case, as made by the bill and   his evidence,  is that the
conveyance in question never was agreed upon nor intended.
He assails the deed as a rank and unmitigated fraud, utterly
precluding any consideration; and the  existence of  the two
deeds  in point of  date, a mere circumstance which  may  be
said to argue something  in support of  the defendant's con-
tention,  is not conclusive.   It is relied · upon by one party
as having been seized' upon  by  the  other, as the opportune
occasion and time  for the commission of  a fraud, and by the
other as the consideration for  the  alleged  fraudulent deed.
As to which of  these contentions  shall  prevail, it depends
upon the ultimate finding, involving  the consideration of  all
the evidence.

The direct,  positive testimony of  the defendant and his
wife  to  the  alleged  deliberate and specific agreement, in
pursuance of  which they say the deed was made and execu-
ted,  is not unusual in cases of this. kind.   In most cases in
which deeds have been assailed  on  the ground of  fraud in
the procurement thereof, similar testimony is found, and the
courts are under the painful duty of  allowing the facts and
circumstances with which  it conflicts, to overcome it and
brand it as false.   Usually such evidence bears on  its face
indications of fabrication.   It often attempts to prove too,
much, and it was the opinion of the court below· that this is
true of  the evidence now  under consideration.   The de-
fendant admits that he took the  precaution to fix a date for
the all important conference  between himself and his father
at which his wife  should  be  present as  a secret witness.
Though it is said she did not eavesdrop, or secretly overhear
what is said  to have passed  between the parties, it does ap-
pear that she did  not sit down in the room  with her hus-
band and father-in-law  as is  usually  the  case in a friendly
family conference.   On the contrary,  she came into  the hall
behind  the  father-in-law  and  stood at or near the  door
opening into the  room,  where  she could  hear  and  not be
seen, if she chose to do so.   Suddenly and without previous
notice, a proposition,  monstrously  disproportionate and un-
equal in respect  to reciprocal advantages,  is sprung  upon
Hale,  and he, without a  moment's hesitation, eagerly and
joyfully accepts.   He does not even ask  for  a modification.

There is no parley or counter-proposition, as is usual when a man is placed at a disadvantage and a hard bargain is thrust upon him. The trial judge said in plain terms he could not believe the story, and it does carry improbability on its face. According to the testimony of both, P. M. Hale then and there heard the hard proposition for the first time and eagerly accepted it. Then the two witnesses differ in respect to some matters, and the deed itself does not embody the whole of the alleged agreement. It does not reserve to the plaintiff the use of a room in the house or any portion of the estate. The only reservation made for the benefit of Hale is carefully omitted from the deed, so that he may be at any time ejected from the premises. It is charged that this reservation as well as exception of the numerous lots previously sold, was omitted partly out of unusual haste incident to the striking of a blow at the opportune moment, and partly to avoid exciting suspicion or inquiry by the unusual length of the deed. Though these circumstances may be sufficient to cast some doubt upon the truth of the testimony of these two witnesses, they might not be sufficient to overthrow it, if they were unaided by others. But there are others affording almost irresistible refutation of this evidence. Long after the deed was executed, plaintiff went hurriedly to the clerk's office of the county court to see whether there was such a deed in existence, telling the clerk he had heard so. Was this only for the purpose of making a witness of the clerk? Was it a mere attempt to manufacture evidence? If it stood alone, it might possibly be disposed of in this way, but there was another occasion on which he acted in the same manner. About a year after the date of the deed, he sued Dr. Nichol for rent, under the impression that he had the right to do so. At the trial of that case, the defendant was present as a witness. Without his knowledge, the plaintiff went to Mrs. Hale and obtained her signature to a paper, declaring that the stable belonged to him and this was produced and read in the presence of the defendant who did not then disclose his alleged ownership of the property nor reveal the fact that he had a deed for it. What motive did he have in remaining silent on that occasion, when the production of his deed would have enabled his brother-in-law, Dr. Nichol, to defeat the action.

Was he, too, manufacturing evidence for his antagonist?
Such a conclusion would be an absurdity. This circum-
stance, as to which there can be no doubt, and as to which
there is no controversy, argues strongly Hale's ignorance,
at that time, of the existence of the deed in controversy,
and tends to prove the sincerity of his inquiry at the office
of the clerk of the county court. Concede that the pro-
duction of the paper signed by Mrs. Hale was not essential
to recovery against Dr. Nichol, that having rented from
Hale he was estopped from denying the title of his land-
lord, and that T. W. Hale was only a witness in the
case, the facts remain that he and Nichol were brothers-
in-law, from which it may well be assumed that all were
familiar with the status of the property, and that the de-
fendant in this cause was then testifying against his father's
right of recovery from his brother-in-law. Aside from his
duty to speak and any inference arising from his silence,
the conduct of the plaintiff was consistent with his ignorance
of the deed, and the circumstance precludes the view that he
was fabricating evidence for use in this case. It was a step
in any other action, the institution of which alone argues the
same thing. Besides, T. W. Hale was under a sworn duty,
as a witness, to disclose all he knew, bearing on the ques-
tion at issue.

In reaching this conclusion, we are not unmindful of the
rule requiring clear and satisfactory proof to overthrow a
deed. The flat contradiction of the direct and positive
oral evidence, pro and con, brings into play the circum-
stances and necessarily gives them unusual prominence and
force. To them the court must appeal for the truth, it
having been effectually obscured by the testimony of the
parties, and the duty of the court cannot be evaded or ex-
cused by the difficulty or painfulness of the task. Nor is its
investigation or power to act limited by the mere number of
the circumstances to be considered. Their intrinsic character
and power to carry mental conviction as to the truth is al-
ways allowed to prevail. Circumstances, to which we have
adverted, and the force of which is not impaired or resisted
by any thing but the contradicted parol testimony, weakened,
as it is, by the improbability of the story it tells, say the
plaintiff knew nothing of the contents of this deed for a long

time after the execution thereof, and nothing is relied upon to contradict them but mere conjecture and suspicion. It is hardly necessary to say this Court will not reverse the finding of the court below, on a question of fact, when it does not appear to be clearly wrong.

For the reasons stated, the decree will be affirmed.

*Affirmed.*