[No. 14035. Department One. November 13, 1917.]

AMERICAN SAVINGS BANK & TRUST COMPANY, *Respondent*, v. BREMERTON GAS COMPANY *et al., Defendants*, ILLINOIS SURETY COMPANY, *Appellant.*[1]

FRAUD—CONSPIRACY TO DEFRAUD—EVIDENCE—ADMISSIBILITY. In an action upon notes and surety bonds guaranteeing the same, defended on the ground of fraudulent conspiracy between the manager of the payee and the agent of the bonding company, evidence that the agent had no authority to issue the bonds and failed to report them to the company, and that the payee was put on inquiry and warned by an expert that the agent had no authority to execute the bonds, and yet failed to heed the warning or investigate, is admissible to show bad faith and intent to take advantage of the surety company.

SAME — EVIDENCE — SUFFICIENCY. Such evidence is sufficient to make a case for the jury under the rule, peculiarly applicable to conspiracy to defraud, that inference of fraud may be gathered from surrounding circumstances.

[1]Reported in 168 Pac. 775.

Appeal from a judgment of the superior court for King county, Frater, J., entered November 29, 1916, upon separate verdicts of the jury rendered by direction of the court, in consolidated actions on contract. Reversed.

*Piles & Howe, Stephen V. Carey,* and *Earl M. Brockett,* for appellant.

*Farrell, Kane & Stratton,* for respondent.

WEBSTER, J.—These suits, three in number, were tried upon the same evidence and before the same jury, which was directed by the court to return separate verdicts for specific amounts against the defendants in each case. The gas companies defaulted. The Illinois Surety Company appeals. In the first case, the Bremerton Gas Company was sued upon its promissory note for $25,000 in favor of the respondent bank, and the surety company was sued upon its bond for $45,000 given to secure the indebtedness evidenced by the note. The second was against the same defendants and upon the same bond, the only difference being that two notes, each for $10,000 and each made by the Bremerton Gas Company were involved. The third was against the appellant and the Montesano Gas Company and was upon the gas company's note for $25,000 and a bond for the same amount executed by the appellant surety company. The cases have been consolidated for the purpose of appeal and will be disposed of together, as they arise out of the same transaction. As the bonds are alike, we need only set forth the one given to secure the Bremerton Gas Company's note:

"Know all men by these presents, that we, Bremerton Gas Company, a corporation duly organized and existing under and by virtue of the laws of the state of Washington (hereinafter called the principal) as principal, and Illinois Surety Company, a corporation of the state of Illinois (hereinafter called the surety) as surety, are held and firmly bound unto the American Savings Bank & Trust Company (hereinafter called the obligee) in the sum of forty-five thousand dollars

($45,000), for the payment of which well and truly to be made, the said principal and the said surety bind themselves, their and each of their successors and assigns jointly and severally firmly by these presents.    Dated this 19th day of March, 1915.    The conditions of this obligation are such that whereas the above named principal has applied to the said obligee for loans not exceeding in the aggregate forty-five thousand dollars ($45,000), to be evidenced by promissory notes of the said principal; and whereas the above bounden surety has made, executed and delivered its bond to the said obligee as trustee for the completion of certain gas works in Kitsap county, free from all liens and incumbrances by reason of which the said surety is interested in securing the said loans for the said principal now therefore, if the above bounden principal shall pay or cause to be paid said loans with the interest thereon to be evidenced by promissory notes or any renewal or renewals of the same, and shall comply with the terms thereof, then this obligation shall be void otherwise to be and remain in full force and effect; and the said surety does further agree to indemnify and save and keep harmless the said obligee from all loss and expense by reason of the making of said loans or any of them.    In witness whereof, said principal has caused this instrument to be executed by its duly authorized officers, and the surety by its duly authorized attorney in fact, the day and year first above written.

"Bremerton Gas Company.

"By W. C. Morris, General Manager.

"Illinois Surety Company.

"By Frank G. Opie, Its Attorney in Fact.

(Illinois Surety Company seal.)"

It will be observed that these bonds are executed "Illinois Surety Company, by Frank G. Opie, Its Attorney in Fact." The appellant insists that Mr. Opie had no authority to bind it by the bonds and that they were written as part of a collusive scheme to defraud it.    To clarify a somewhat complicated situation, we may state, as a preface to a discussion of the evidence, that, on September 22, 1914, the respondent loaned a concern known as the Auburn Gas Company, the sum of $10,000 upon its promissory note.    This note was paid

at maturity and is not involved except so far as it relates to subsequent transactions. It loaned the Bremerton Gas Company $25,000 on December 22, 1914. This loan was renewed on March 19, 1915, and again on June 17, 1915, by the discount of the promissory note sued upon in the first case. An additional $20,000 was loaned later, and two notes, dated July 6, 1915, and July 21, 1915, respectively, represent the indebtedness and are the ones sued on in the second case. On March 24, 1915, the Montesano Gas Company borrowed $25,000 upon its note, which was renewed on June 22, 1915, by the note sued on in the third case. The method by which the money was borrowed and secured was the same in each case and was substantially as follows: The borrowing gas company executed a deed of trust upon its plant to secure a series of what are called industrial bonds. The respondent was named as trustee thereunder. The issues of the Auburn and Montesano Companies were for $50,000 each, and of the Bremerton Gas Company, for $100,000. Contemporaneously with this, Mr. Opie would write two bonds in the name of appellant and affix its corporate seal thereto. One of them was called the construction bond, and was given to guarantee the completion of the gas plant, free of liens. The other was executed to secure the amount advanced by the respondent bank. The industrial bonds, secured by the deed of trust upon the plants, would be held by the bank, subject to the appellant's order.

It is first contended that Mr. Opie had no authority to execute the bonds. The powers under which he was acting are the same as those just considered by us in the case of *German-American Mercantile Bank v. Illinois Surety Co., ante* p. 9, 168 Pac. 772. The bond discussed there is similar to those sued upon here and, for the purpose of this opinion, may be treated as identical. It follows, therefore, that our conclusion in that case as to the extent of Mr. Opie's authority, is controlling here. There remains to be considered the question of fraud.

The appellant claims to be the victim of a conspiracy among Frank G. Opie, James B. Gleason and W. C. Morris. When the notes were given, Mr. Opie was appellant's general agent within the state of Washington, Mr. Gleason was the manager of the respondent bank, and Mr. Morris was the promoter of gas companies engaged in the business of manufacturing gas from sawmill waste. Among these were the Auburn, Bremerton, and Montesano Companies.

Fraud or no fraud is usually a question of fact for the jury. *Bjorklund v. Seattle Elec. Co.*, 35 Wash. 439, 77 Pac. 727; 12 R. C. L. 444. In order to determine whether the court was justified in directing verdicts in favor of respondent, we must review the circumstances by which the negotiation of the notes was surrounded, for the reason that fraud is the handmaid of secrecy and falsehood and is not generally susceptible of direct proof. In the process of examination, we must marshal the facts and treat the attendant events as a cumulative whole and not as isolated transactions; "for fraud, being essentially a matter of motive and intention, is often deducible only from a great variety of circumstances no one of which is absolutely decisive but all combined together may become almost irresistible as to the true nature and character of the transaction in controversy." Story, J., in *Wood v. United States*, 16 Pet. (U. S.) 342.

Mr. Gleason testified that he had been a banker about fifteen years and had been making loans to business men for commercial purposes. His first acquaintance with this matter was about September 7, 1914, when he was visited by Mr. Opie, who represented himself to be appellant's agent. Mr. Gleason is quite indefinite as to how well or how long he had known Mr. Opie prior to this time, but we are satisfied that he made his acquaintance but a short time before and that they had had little, if any, business with each other. On this occasion Mr. Opie explained generally the business of the Auburn concern, and the fact that funds were needed to complete its plant. He wanted the respondent to loan it $10,000

for that purpose, and said that he was about to write a construction bond in appellant's name, guaranteeing that the plant would be finished free and clear of liens, and if the respondent would loan the sum desired upon the gas company's note, that he would write another bond to secure its payment. He also said that the plant would cost $60,000, and that the gas company desired to float an issue of bonds for $50,000, secured by a trust deed or mortgage upon its plant and that he wanted the respondent to act as trustee thereunder. To be brief, all of Mr. Opie's requests were granted and the loan consummated without any investigation as to the stability of the gas company or the feasibility of the scheme upon which it was embarking.

The Bremerton and Montesano loans were made in the same manner and also entirely upon Mr. Opie's representations and without investigation, but it may not be amiss to go into the facts a trifle more in detail. In the case of the Auburn loan, industrial bonds were issued to the amount of $50,000, secured by a deed of trust upon its plant, under which the respondent was named as trustee. These bonds were delivered to the respondent for appellant's account and to protect it from loss upon the so-called construction bond and the bond issued to secure the note. Contemporaneously therewith, and on September 24, 1914, the gas company's note for $10,000 was cashed and the money deposited to its account in the respondent bank, subject to checks countersigned by Mr. Opie. Mr. Opie then executed a construction bond, guaranteeing the completion of the plant and another to secure the note. Appellant's corporate seal was affixed thereto by Mr. Opie and respondent was named as obligee in each of them. The note was for ninety days, and matured on December 22, 1914, when it was paid by a check drawn on the State Bank of Seattle and signed "Illinois Surety Company, by Frank G. Opie, Attorney in Fact." Mr. Gleason denies any knowledge of where the funds against which this check was drawn, were obtained. Before the maturity of the Auburn note, Mr. Opie

commenced negotiations for the loan to the Bremerton Gas Company which was perfected on the very day the Auburn note was paid. This transaction is identical with the first, save that the issue of industrial bonds was for $100,000, the note was for $25,000, though a credit of $45,000 had been extended and the bond securing the indebtedness was for $45,000. This bond was substituted by the one in suit when the note matured and was renewed on March 19, 1915. The remaining $20,000 of the credit extended the Bremerton Gas Company was loaned some time later and is represented by its two $10,000 notes, dated July 6, 1915, and July 21, 1915, respectively. Five days after the maturity and renewal of the Bremerton Gas Company's $25,000 note, a loan of $25,-000 was made to the Montesano Gas Company, without material variation in the mode of procedure. Thus it will be seen that, upon the completion of this transaction, the respondent had loaned or obligated itself to loan the defendant gas companies the sum of $70,000.

At this point, let us pause and see what, if any, precautionary steps were taken in connection with the loans. In this respect, we have only the testimony of Mr. Gleason who, being an adverse witness, and vitally interested, was naturally predisposed in favor of the respondent. There is, to be sure, the testimony of Mr. Stratton, the respondent's attorney, but his duties were limited to an investigation of certain legal aspects of the matter and in no way related to the allowance of credit. In referring to the testimony, we shall quote from the abstract for the sake of brevity, notwithstanding we have carefully examined the statement of facts. Mr. Gleason testified that he had no dealings with any officer of the gas companies, although he had heard that Mr. Frank McCandless, of Tacoma, whom he said he had known for nearly twenty years as a man of absolutely good standing, was president of the Auburn Gas Company. He made no inquiry of any officer or elsewhere as to the standing or prospects of the gas com-

panies, and even did not know by whom their stock was owned. All of the information he had concerning the enterprise came through Mr. Opie. In this connection he testified:

"I never knew or suspected that Mr. Opie had any knowledge of the practical construction or operation of a gas plant. I made no inquiry from him or from any one else to verify his statement that a gas plant could be constructed and put in operation out at Auburn for $60,000. I might care, but I was relying on the bond which I was taking from his company."

He further stated:

"I didn't know whether they were making it (gas) out of wood or coal or iron or steel. That was not my business. I made no inquiries as to what they intended to make their gas out of."

Although he admitted that he knew that, in the usual course of events, such securities as the industrial bonds would find their way into the hands of the public, he nevertheless neglected to make any inquiry as to the security behind them. That, he thought, was the business of the Illinois Surety Company. Recklessly ignorant of conditions and without inquiry or investigation, he willingly permitted his trust company to endanger its standing as a financial institution by lending its name as trustee under the deeds of trust. He relied upon the bond which Mr. Opie wrote to secure the loan, but must have realized that the appellant was not back of the industrial bonds and was not guaranteeing the successful operation of the plant. All of his dealings were with Mr. Opie, even to the details and terms of the deeds of trust given to secure the industrial bonds. Continuing, he testified:

"I knew Mr. McCandless in Tacoma a great many years. I never called him up by 'phone and never wrote him a letter and made no inquiry from him whatever as to what his connection with the matter was. I did not have to. I did not care whether he was simply holding a nominal interest in the matter or had a substantial interest."

In addition, he said that there was no man of financial standing in the northwest, so far as he knew, that was affiliated with any of these projects.

"Q. You made no investigation then, as to who was back of the project. A. I did not know who was the stockholders in it. We were depending entirely on the strength of the Illinois Surety Company to carry out its obligations."

He said that he did not know Mr. Morris, by whom all of the gas companies' notes were signed, until he met him in connection with the Montesano loan in March, 1915, this being the last of the series of transactions.

"Q. And if you never saw Mr. Morris, never knew him, never knew anything about him, how did you know that that was really a note of the Auburn Gas Company that was covered by the bond? A. That note was made in my attorney's office. The proper resolutions drawn by him and furnished to the bank at the time that that note was delivered to the bank."

Mr. Stratton, the attorney referred to, denied that the note was signed in his office. Mr. Gleason claims that Mr. Opie told him the industrial bonds of the Auburn and Bremerton Companies were sold as soon as they were ready for delivery, and again:

"The same thing applies to the Montesano Gas Company. In fact they ordered the bonds sent east, claiming that they were sold, instructing us to collect some $40,000 of the $50,-000 issue, but the bonds were returned to us and not taken by the party to whom they were sent. The Montesano Gas Company's bonds were sent to some firm in Nebraska at the request of the Illinois Surety Company and the Montesano Gas Company."

He testified that he had no dealings with the appellant, except through Mr. Opie; and, when he said that the Illinois Surety Company said this or that or directed that something be done, he meant that Mr. Opie did so. Going back to the Auburn loan, it appears that Mr. Gleason called Mr. Stratton, his attorney, whom he introduced to Mr. Opie in the

bank.  In the presence of Mr. Opie and Mr. Stratton, he asked Mr. Allen over the telephone whether the agent of a bonding company had the general power to write bonds guaranteeing the payment of promissory notes.  Mr. Allen said that he, Allen, did not have, and would not exercise such authority without getting special instructions from his home office.  Mr. Gleason repeated his answer to Mr. Opie and Mr. Stratton and Mr. Opie said, according to Mr. Gleason:

"It don't make any difference what Mr. Allen said.  I have got a general power of attorney from my company and I have authority and I have been writing such bonds."

The reason for calling Mr. Allen was because he was the state agent of the National Surety Company, a man of experience in that line and had done considerable surety business for Mr. Gleason.  The matter was then turned over to Mr. Stratton for the purpose of preparing the necessary documents.  Mr. Stratton testified that he first met Mr. Opie some time in September, 1914, when Mr. Gleason telephoned him to come to the bank, where he introduced Mr. Opie to him as the general agent of the Illinois Surety Company.  He had never heard of the Auburn Gas Company before that time, but Mr. Gleason stated in Mr. Opie's presence that there were some papers to be drawn, and generally described the transaction.  He requested Mr. Stratton to examine the articles of incorporation and all the organization papers of the Auburn Gas Company.  Mr. Stratton testified that he then asked Mr. Opie whether he was the agent of the surety company.  Mr. Opie became somewhat "peeved because I would ask him that question.  He was noticeably angry," and said that it was necessary to hurry up the issuance of the bonds, otherwise he would lose the business, because other surety companies wanted it.  He stated that he had written for that company all kinds of bonds for several years and was ugly because Mr. Stratton desired to know concerning his authority.  They then went to Mr. Stratton's office where Mr.

Opie showed him the bonds which he, Opie, had drawn. They were all signed "Illinois Surety Company, by Frank G. Opie, its Attorney in Fact," and the seal of the company was affixed. Mr. Stratton said he would have to investigate the matter, go over the organization papers, etc., which would take some days. He objected to the bonds as prepared by Mr. Opie who went out of the office in a huff. That day, or a little later, Mr. Stratton went to the auditor's office in Seattle to examine certain powers of attorney which Mr. Opie told him were on file. Later, he telephoned the office of the state insurance commissioner and had read to him the application for the appointment of Mr. Opie as agent for appellant, the company's charter and the power of attorney exhibited in evidence. He examined the articles of incorporation of the Auburn Gas Company, and also drew a resolution whereby the stockholders and trustees of the Auburn Company empowered Mr. Morris to borrow money and sign notes in its behalf. When things were in readiness to be closed, Mr. Opie and Mr. Morris came to Mr. Stratton's office and signed the bond guaranteeing the note. The construction bond, Mr. Stratton thinks, had been signed by the officers of the gas company before, but Mr. Opie signed it and affixed the appellant's corporate seal at that time. The note, as we have already said, was not signed in Mr. Stratton's presence. That closed the transaction and was the last Mr. Stratton heard of the matter until he was called to the bank by Mr. Gleason in December, 1914, to confer with Mr. Opie relative to the Bremerton loan. This transaction, so far as it relates to an examination of the corporate records and to the investigation of Mr. Opie's authority, was conducted by Mr. Stratton in substantially the same manner as the Auburn deal, save only that he telephoned and had the state insurance commissioner send him certified copies of the papers theretofore read to him over the 'phone. Mr. Opie chafed at the delay and called Mr. Stratton's attention to the Auburn bond which he said he had reported promptly.

The Montesano transaction is identical with the others, save that Mr. Stratton took no part therein and did not know that it had been consummated. Mr. George W. Allen called by appellant, testified that he had been state agent for the National Surety Company for about eleven years. He recited the telephone conversation referred to by Mr. Gleason and stated that he told him that, from his knowledge of the surety business, no agent had authority to write such bonds as those in suit. Mr. Opie then came to his office, Mr. Gleason having told him to do so. He then said that later on, he had another talk with Mr. Gleason in the bank,

"similar to what I had told him over the telephone. I did the business for Mr. Gleason's bank in the bonding line and I was in there frequently and he consulted me oftentimes with reference to matters of suretyship and when I was in the bank subsequent to the telephone conversation, we had a repetition of the same conversation, in which I warned him that this man would not have the authority to write bonds of this nature, from my knowledge of the surety business and from my knowledge of his company's instructions and authority. Q. Now Mr. Allen, in this connection did Mr. Gleason indicate to you what loans he was proposing to make? A. It was a loan to the Bremerton Gas Service Corporation or Company. Q. He mentioned that fact, did he? A. Yes, sir, he did, he identified it."

Upon motion of counsel for respondent, all of Mr. Allen's testimony was stricken. It may not have been, indeed it was not admissible for the purpose of contradicting the power of attorney held by Mr. Opie, but that was not the purpose for which it was introduced. It was competent as shedding light upon Mr. Gleason's good or bad faith. Mr. Gleason, in the absence of other knowledge, had the undoubted right to rely upon the power of attorney, but he saw fit to put himself upon inquiry. He had become suspicious of Mr. Opie's representations as to his authority and undertook an independent investigation. The result of his inquiry was the information from one peculiarly in a position to know that Mr. Opie had

no power to write the bonds. Notwithstanding this, he completely and deliberately ignored the very information he had sought. The means of knowledge were readily at hand. He could see, but seemed unwilling or afraid to look. Such utter lack of the inquisitive instinct on the part of a successful and experienced banker is incredible upon any supposition short of the utter absence of common prudence or a deliberate intent to take an unconscionable advantage of the surety company. Instead of employing counsel to search records and telephone the state capitol, it would have been safer, cheaper, and easier to have communicated by telegraph with appellant's home office. Its reply would have eliminated all doubt and removed all suspicion and have rendered the uncertain certain beyond controversy. When fraud is charged, the strict rules of evidence should be relaxed in order that every material circumstance, though remote, may be shown,

"From the very necessities of the case, and from the fact that fraudulent intentions are always hidden, and that fraudulent motives are always concealed or attempted to be concealed, courts allow the widest possible latitude consistent with established rules of law in the investigation of causes wherein fraud is alleged; and the rules governing the introduction of testimony are necessarily relaxed." *O'Hare v. Duckworth*, 4 Wash. 470, 30 Pac. 724.

See, also, *Collins v. Hoffman*, 62 Wash. 278, 113 Pac. 625, Ann. Cas. 1913A 1.

Appellant offered to prove by three of its officers that the company had never written or authorized Mr. Opie to write bonds of this character and that the ones written had never, been reported to the company by him. It goes without saying that the respondent is not to be held responsible for Mr. Opie's neglect in this respect, unless it participated; but, on the other hand, unless the appellant was permitted to prove that it had no knowledge of the bonds, it would be estopped to question Mr. Opie's authority. Its silence would amount to acquiescence. It follows, therefore, that, as a circumstance

in the chain of events, the evidence was competent and should have been admitted.

It is alleged that Mr. Gleason insisted that Mr. Morris arrange for the state treasurer to deposit $50,000 of state funds with the respondent bank out of which the loan to the Bremerton Gas Company could be made. It was proved by Mr. Gleason that the loan to the Bremerton Gas Company was preceded by a deposit of state funds on December 15, 1914. It further appears that no deposit was made by the state treasurer with the respondent for more than a year prior thereto with the exception of one for $5,000 made a few days before the $50,000 deposit.

Fraud is a thing to be described, rather than defined. Deception may find expression in such a variety of ways that most courts have studiously avoided reducing its elements to accurate definition. Human foresight is not sufficiently acute to anticipate the secret and covert methods of the artful and designing or of those who endeavor to reap where they have not sown. Once let it be known what the courts consider fraudulent and those engaged in its perpetration will busy themselves in inventing some means of evasion. The courts, therefore, should content themselves with determining from the facts of each case whether fraud does or does not exist. While fraud is not lightly to be inferred, it does not follow that the inference of fraud cannot be gathered from surrounding circumstances, provided they are of sufficient strength and cogency to overcome the presumption of honesty and fair dealing. This rule is nowhere better stated than by Judge Cooley in his valuable treatise on the law of Torts:

"Fraud is never presumed, and the party alleging and relying upon it must prove it. This, however, is one of those rules of law which is to be applied with caution and circumspection. So far as it goes, it is based on a principle which has no more application to frauds than to any other subject of judicial inquiry. It amounts but to this, that a contract,

honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial. Fraud is, therefore, as properly made out by marshaling the circumstances surrounding the transaction, and deducing therefrom the fraudulent purpose, when it manifestly appears, as by presenting the more positive and direct testimony of actual purpose to deceive; and indeed, circumstantial proof in most cases can alone bring the fraud to light, for fraud is peculiarly a wrong of secrecy and circumvention, and is to be traced not in the open proclamation of the wrongdoer's purpose, but by indications of covered tracks and studious concealments. And while it is often said that to justify the imputation of fraud, the facts must be such as are not explicable on any other hypothesis, yet this can mean no more than this, that the court or jury should be cautious in deducing the fraudulent purpose; for whatever satisfies the mind and conscience that fraud has been practiced is sufficient." Cooley, Torts (2d ed.), p. 556.

Cases of the character here under consideration where a conspiracy to defraud is the gist of the charge, are peculiarly within the spirit and reason of this rule, because from their very nature, the allegations are only susceptible of proof by circumstantial evidence. The disregard of Mr. Allen's warning, the precautions taken to scrutinize every instrument by which the appellant could be bound, as opposed to the utter lack of investigation of the affairs of these mushroom gas companies, the fact that the loans were made without consulting the gas companies' officers, at the behest of one who could have no interest in them except such as, under the circumstances, would be incompatible with his duty to the appellant, as his principal, are, to say the least, not suggestive of fair dealing. The fact that the Montesano loan was not made until after the maturity and renewal of one of the Bremerton notes adds suspicion. This is emphasized when we recall that Mr. Gleason said that Mr. Opie told him at the inception of the transaction that the Bremerton Industrial Bonds were sold when they were ready for delivery. He told him the same thing three months later about the Montesano

bonds. Is it not remarkable that it never occurred to Mr. Gleason as strange that the Bremerton bonds had not been paid for in the interval, if they had been sold the preceding December? The bonds were then in his possession and he knew they had not been delivered.

Much is made of the fact that the Auburn note was paid at maturity by a check signed by Mr. Opie as appellant's attorney in fact. We do not think this is particularly favorable to respondent, but to the contrary, for the reason that compensated sureties do not ordinarily pay off and discharge one guaranty and simultaneously bind themselves upon a similar and larger obligation. The coincidence in point of time of the Bremerton loan and the state deposit has its bearing, and the fact that the bonds in suit recite that the appellant had obligated itself upon the construction bond and is therefore interested in the loan, in the light of the fact that the bonds were delivered simultaneously, is not the exact truth and is a highly important circumstance. If the appellant, at the time Mr. Opie undertook to obtain the loans, had been bound on the construction bonds and the money advanced was to be used in paying claims arising out of the construction of the plant, for which appellant was already liable, the transaction would have been a natural and reasonable one. But when liability on the construction bonds is assumed at the very time the money is advanced, it impresses us as most extraordinary.

"It is insisted that the proceedings were all conducted according to the forms of law. Very likely. Some of the most atrocious frauds are committed in that way. Indeed, the greater the fraud intended, the more particular the parties to it often are to proceed according to the strictest forms of law." *Graffam v. Burgess*, 117 U. S. 180, 186.

We are unable to create any scale by which the quantity of testimony necessary to establish fraud may be weighed. Motive and conduct and situation of the parties are, after all,

2—99 WASH.

the only means by which its existence can be detected. Tested by all the circumstances and viewed from all angles, we are of the opinion that these cases should have been submitted to the consideration of the jury.

The judgments appealed from will be reversed and the causes remanded for new trials, not inconsistent with this opinion.

ELLIS, C. J., CHADWICK, MAIN, and MORRIS, JJ., concur.