[No. 24749. Department Two. January 11, 1934.]

BJARNE KNUTSEN, *Respondent,* v. ALITAK FISH COMPANY *et al., Appellants.*[1]

*Kerr, McCord & Carey,* for appellants.
*Winter S. Martin,* for respondent.

GERAGHTY, J.—Plaintiff brought this action for himself and as assignee of the claims of eight others, all fishermen, to recover sums alleged to be due for fish caught and delivered to defendant during the fishing season of 1932. Three corporations were named defendants in the complaint, but as defendant Pacific American Fisheries is the one substantially concerned, it will be referred to hereafter as sole defendant and appellant. In the course of the trial, the several amounts recoverable by plaintiff on his own account and as assignee, if the verdict should go in his favor, were stipulated. The cause was tried to a jury, who

[1]Reported in 28 P. (2d) 334.

returned a verdict in favor of plaintiff, from which defendant appeals.

Respondent's complaint alleged the execution of a written contract of employment by himself and his assignors with the appellant; that appellant had not paid respondent and his assignors the full sums due them for services under the contract; and that there were due the sums severally set out in the complaint. A separate contract was entered into with each of the men whose claims are involved here. The contracts were identical in form, and will be referred to for convenience as if the parties had all joined in the execution of one instrument. The part of the contract material here is as follows:

"Party of the second part agrees . . .

"To pay the following prices for fish delivered to the Cannery tender or Cannery—

| Reds | 12½c | Cohoes | 8c |
| Pinks | 2c | Chums | 2c |

"To pay for all labor performed in preparation for fishing season and laying up gear at rate of Two Dollars and 50/100 ($2.50) per day from the date of sailing from Bellingham until departure of the party of the first part for the fishing grounds, and to pay at the same rate from the day fishing stops for the season until the arrival of boat in Bellingham. It being understood however that these wages are paid to cover any work required by the Superintendent or Foreman."

The appellant's answer admitted the execution of the contract, and pleaded the execution of another and later agreement by respondent and his assignors, modifying the first in respect to the prices to be paid for fish, as follows:

"We, the undersigned, hereby agree that if the going price for fish in the Kodiak District is less than our contract price heretofore agreed and signed, the Pa-

cific American Fisheries hereby is relieved of the original contract and in lieu thereof we agree to accept the going price for fish in the Kodiak District.''

In his reply, respondent admitted the execution of this supplemental agreement, but alleged that he and his assignors were induced to sign the same by fraud and deceit.

The appellant operates canneries in Alaskan waters. The cannery for which the men were employed to fish is in Zachar Bay, Kodiak Island. Respondent and his assignors had worked for appellant during the fishing season for several years previous to 1932. Appellant began early in the year 1932 to make arrangements for the succeeding fishing season, and, prior to the date of the execution of the original contract, had negotiated with the men for the season's work. With the exceptions mentioned hereafter, the contract was signed at the company's office in Bellingham on or about April 30th, and the men were advised that they were to ship from South Bellingham for the cannery May 7th, when they were to appear at the company's office to pass medical inspection, sign necessary shipping papers, and procure their tickets for transportation.

The men appeared at the company's office on May 7th, pursuant to this arrangement. The boat was to leave at three o'clock in the afternoon. It appears that groups of employees for other canneries were sailing on the same ship, and there was considerable hurry and confusion in the execution of the shipping papers, in medical inspection, and in the general arrangements incident to the voyage. Appellant's bookkeeper testified: ''On sailing day, procedure is fast and furious.''

Respondent and his assignors came to appellant's office about an hour before sailing time, where they found certain papers to be signed lying on the desk—

two or three papers, as they testified. They had shipped many times before, and understood the formalities and that they would be required to sign shipping papers giving details in relation to their family status, age and place of birth, etc., and designating to whom certain allotments of their wages were to be made.

The appellant had prepared in advance, in typewriting at the top of a sheet of ordinary typewriting paper, the supplemental agreement, and this was on the desk with the other papers. This agreement had a numbered line for each man, with a blank space for his signature and his name typewritten following the blank. Respondent and his assignors testified that, after the signing of the first agreement of April 30th, they had not been notified of any change in price, and that they signed the supplemental agreement without knowledge of its contents, assuming it to be one of the so-called shipping papers necessary to be executed. They testified that the paper was underneath the other papers, and they did not see the writing at the top and were induced to believe that it was one of the regular and necessary papers to be signed before shipment. Some testified that the clerk in charge kept his hands on the paper so they could not read what it contained. This was explicitly contradicted by officers and employees of the appellant.

Two of respondent's assignors had not signed the original contract of April 30th. They came to the company's office on the morning of the 7th, and signed this contract. The supplemental agreement was not submitted to them at that time, but was signed in the afternoon when they came back to sign the other papers. The supplemental agreement was signed by one of the men on board ship two days out of Bellingham.

The men arrived at the cannery May 15th, and were employed for the rest of the month in putting the fishing gear in order for the season's fishing, which would commence June 1st. At the cannery, the men ate at a mess-house, and on May 19th the appellant's superintendent posted on the mess-house the following notice:

"Owing to the recent heavy declines in the market value of all canned salmon, a reduction in price of fish purchased must be made.

"From this date the following prices for fish received at this plant will be paid:

| Company Gear | | Private Gear |
|---|---|---|
| .10c | Reds | $.15 |
| .01c | Pinks | $.01 |
| .01c | Chums | $.01 |
| .03c | Cohoes | $.05 |

"This move by the company is absolutely necessary and your co-operation is requested. However should any of you wish to be relieved from fishing at these prices return transportation will be furnished upon the return of the S/S Catherine D.

Pacific American Fisheries,
Zachar Bay Cannery,

By A. S. Foster, Supt."

While the appellant does not claim that, by this notice, it could modify the original contract, significance is attached to it as indicating to the men that there was to be a departure from the prices specified in the original agreement. As it developed, the prices set out in this notice were the prices ultimately paid the men. Respondent testified that he was not interested in this notice and did not read it, because he had his contract; and that was doubtless the attitude of the other men.

The fishing season closed toward the end of August, and the men were returned to Bellingham by appellant; a boat touching at the cannery for that purpose. On board ship on the return to Bellingham, the men

were given drafts for the amounts due them, according to appellant's view of their rights under the contracts. Respondent and some of the other men protested that the payments were not sufficient. They were told by appellant's officers that they had signed contracts and nothing could be done until they reached Bellingham, where they could call upon appellant's president. The men designated two of their members to call upon the president, who in turn said they would have to see appellant's attorneys in Seattle.

Appellant admits the correctness of the court's instruction to the jury upon the law of the case, and appeals solely upon the issue of fraud. It is contended the evidence upon that issue was not sufficient to carry respondent's case to the jury in the first instance, or to support the subsequent verdict.

As we have seen, the respondent and others of the men, upon whose assigned claims he is suing, testified that they were induced to sign the supplemental agreement by representation of the agents of appellant that it was one of the papers necessary to be signed before shipping; that they were not given an opportunity to examine the paper or learn what they were signing; and that the papers were so manipulated at the time of signing that it could not be read. On the other hand, the men were fairly intelligent, could read English, and could, of course, if they had insisted, have learned the contents of the paper before signing. We have also the testimony of appellant's employees, who denied respondent's version of what took place at the time of signing.

But, setting aside for the moment the incidents surrounding the immediate signing of the supplemental agreement, a careful reading of the record cannot but leave the impression that the men were not fairly or frankly dealt with, and that the actions of appellant's

employees and officers, as a whole, if not deliberately intended to deceive the men, were at least effective in doing so. The main contract was signed April 30th, following negotiations with the men. They were then dealt with on equal terms. They were not so dealt with when the supplemental agreement was signed. The signing of this agreement was studiously withheld until immediately before shipment, and placed before the men for signature in the attendant confusion. That it was appellant's deliberate purpose to defer the signing of the supplemental agreement until the last moment of departure, may be inferred from its failure to submit it to the two men who appeared in the morning to sign the original contract.

And so as to the notice posted on the mess-house at the cannery. It could not modify the original agreement, and was unnecessary if the supplemental agreement was binding. But appellant's officers seemed to feel not wholly secure in their position, and desired to throw an anchor to windward. After taking the men to Kodiak Island, fifteen hundred miles distant from Bellingham, this notice was posted, advising the men that they would have to take the prices named, and if they were not satisfied with these prices, they would be taken back to Bellingham.

The supplemental agreement provided for the payment of the going price in the district. It appears that this going price meant no more than the price to be determined by appellant and two or three other canneries in the district. As a matter of fact, it may be fairly inferred from the record that the prices posted on the mess-house had been tentatively, if not definitely, agreed on prior to the signing of the supplemental agreement.

These circumstances tend to characterize the company's course of dealing with the men, and might very

well imply a plan to take advantage of the men's necessities and beguile them into a position where they could not do otherwise than accept whatever price appellant chose to pay. On the question of fraud, these circumstances, with the testimony of the men, even though contradicted, certainly raised sufficient of an issue for submission to the jury.

"Fraud is a thing to be described, rather than defined. Deception may find expression in such a variety of ways that most courts have studiously avoided reducing its elements to accurate definition. Human foresight is not sufficiently acute to anticipate the secret and covert methods of the artful and designing or of those who endeavor to reap where they have not sown. Once let it be known what the courts consider fraudulent and those engaged in its perpetration will busy themselves in inventing some means of evasion. The courts, therefore, should content themselves with determining from the facts of each case whether fraud does or does not exist. While fraud is not lightly to be inferred, it does not follow that the inference of fraud cannot be gathered from surrounding circumstances, provided they are of sufficient strength and cogency to overcome the presumption of honesty and fair dealing." *American Savings Bank & Trust Co. v. Bremerton Gas Co.*, 99 Wash. 18, 168 Pac. 775.

"Fraud is never presumed, and the party alleging and relying upon it must prove it. This, however, is one of those rules of law which is to be applied with caution and circumspection. 'So far as it goes, it is based on a principle which has no more application to frauds than any other subject of judicial inquiry. It amounts but to this, that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial.' Fraud is therefore as properly made out by marshaling the circumstances surrounding the transaction, and deducting therefrom the fraudulent purpose, when it manifestly appears, as by presenting the more positive and direct testimony of actual purpose to deceive; and, indeed, circumstantial

proof in most cases can alone bring the fraud to light, for fraud is peculiarly a wrong of secrecy and circumvention, and is to be traced not in the open proclamation of the wrongdoer's purpose, but by the indications of covered tracks and studious concealments. And while it is often said that to justify the imputation of fraud, the facts must be such as are not explicable on any other hypothesis, yet this can mean no more than this, that the court or jury should be cautious in deducing the fraudulent purpose; for whatever satisfies the mind and conscience that fraud has been practiced is sufficient." 2 Cooley on Torts (4th ed.), § 349.

What is said above, is peculiarly applicable to the facts in the present case. The jury heard the testimony of the witnesses, saw them face to face, weighed the evidence in the light of the position of the parties and the surrounding circumstances, and, under proper instructions from the court, found in favor of respondent. We would not be justified in disturbing their verdict.

The judgment will accordingly be affirmed.

BEALS, C. J., BLAKE, TOLMAN, and HOLCOMB, JJ., concur.