[No. 29677. Department Two. June 20, 1946.]

HARRY J. DOBBIN, *Respondent,* v. PACIFIC COAST COAL COMPANY, *Appellant.*[1]

[1]Reported in 170 P. (2d) 642.

*Graham, Green, Burnett, Howe & Dunn* and *Kenneth C. Hawkins,* for appellant.

*Stuart H. Elliott,* for respondent.

ROBINSON, J.—The substance of the complaint in this cause is as follows:

In July, 1943, the plaintiff, Dobbin, purchased a newly constructed dwelling house in Tacoma from O. R. Tucker, a contractor and builder. The heating unit, already installed, was of a new type called a "chimney furnace." It is alleged that, when the plaintiff put it in operation in the fall, it not only failed to adequately heat the premises but also deposited a film of soot on the interior walls and the furniture and fixtures in the various rooms. It was also alleged that the furnace was manufactured by the Pacific Coast Coal Company; that L. D. Waters and Meda B. Waters, doing business in Tacoma as Allied Home Appliances, were that company's local representatives; and that, as such, they sold the furnace to Tucker and installed it in his house. It was further alleged that the furnace would have to be removed, and some other heating unit installed, at an estimated cost of $1,450, and it was stated that, since all of the parties above named had denied liability, all were named defendants, and judgment was prayed for against each and all. The complaint contained no allegation of fraud, nor any claim of breach of express warranty, but is clearly grounded upon a breach of an implied warranty of fitness.

At the trial, certain facts were established by evidence which was unrebutted and undisputed. These may be summarized as follows:

The furnace, which consists of certain parts and castings, to be installed, as directed, in a chimney to be built by the owner or builder of the house, was manufactured at Dowagiac, Michigan, by the Round Oak Company, which, for many years, has built and marketed various types of furnaces and heating equipment. The parts and castings were put in crates at Dowagiac, Michigan, and shipped to the Pacific Coast Coal Company, a distributor.

Waters and wife were not, as alleged in the complaint, "local representatives" of the Pacific Coast Coal Company, nor were they its agents in any sense whatever. They purchased the crated furnaces from the Pacific Coast Coal Company for cash, as any dealer in household appliances might do, and installed them in the houses of customers, in the

same manner as they sold and installed other household appliances. They had no dealings with the plaintiff, Dobbin. They sold the furnace to Tucker, and when Dobbin purchased the house from Tucker, he acquired it as a part of the realty.

There is also undisputed evidence, which will be more specifically referred to later in this opinion, to the effect that this was about the only kind of house-heating furnace readily procurable at the time it was installed, due to war directives regulating the conservation of oil and metals.

There is further uncontradicted evidence that, before this type of furnace was put on the market, its design was inspected and tested by the Federal bureau of standards, and, by that bureau and by the engineers of the Federal housing authority, approved for installation in dwelling houses to be financed by FHA loans. Incidentally, Dobbin financed his purchase of the house through an FHA loan.

Although there is a very substantial conflict in the evidence, we think it preponderates in favor of the trial court's findings that, in this particular instance at least, the chimney furnace did not furnish adequate heat, that the walls of the room were "smoked up," and that soot was deposited in the interior of the premises.

There was some evidence, given by the plaintiff himself and supported by his wife and another of his witnesses, to the effect that there was something inadequate in the installation of the furnace, particularly in the neighborhood of the circulating fan which operated at the top of the chimney. However, we agree with the trial court that it was not sufficient to warrant a finding of faulty installation as against Waters and wife.

The trial of this case began on November 16, 1944. Due to an unavoidable continuance, evidence was taken but one day at that time, and the trial was renewed on the 20th of December and continued for three days. When the parties rested, the trial judge announced that he would, in due course, render a decision in writing, and a decision was so rendered on January 9, 1945, holding that the plain-

tiff could not recover against any of the defendants. Subsequently, the court granted the plaintiff a reargument, and, about seven weeks after the filing of the first opinion, filed another memorandum decision, holding the Pacific Coast Coal Company liable on the ground of fraud.

The question to be decided here can best be thrown into relief by comparing the two opinions. In both opinions, it is held that the furnace did not adequately heat the house and deposited soot in the interior. In both, it was held that Tucker could not be held liable, since he merely sold the plaintiff a house with a furnace in it without making any representations whatever about the furnace. It was also pointed out, in both opinions, that defendants Waters and wife, who sold the furnace to Tucker and installed it in Tucker's house, never met the plaintiff until long after the transaction. Obviously, they could not be held liable on any theory of warranty, express or implied. In approaching the question of the liability of the Pacific Coast Coal Company, the court used the following language in each of the opinions:

"The furnace equipment was sold by the Pacific Coast Coal Company to Waters for cash. It had no dealings with Dobbins, and the general rule is that a manufacturer is not liable to any person other than his immediate vendee, with these exceptions: '1. When the thing causing the injury is of a noxious or dangerous character; 2. When the defendant has been guilty of fraud or deceit in passing off the article; 3. When the defendant has been negligent in some respect with reference to the sale or construction of a thing not imminently dangerous.' *Bock v. Truck & Tractor, Inc.,* 18 Wash. (2d) p. 465."

However, there is a great difference between the two opinions in the language following that statement of the law. In the first opinion, it is said:

"The present case does not fall within any of these exceptions; therefore neither the manufacturer nor its agent is liable.

"The Court has considered all authorities cited by counsel and others relating to implied warranties and can discover no law granting relief under similar circumstances,

where the personal property sold has been incorporated into a building and transferred in its new character of real estate.

"Plaintiff cannot recover from any defendant and the defendants may take judgment and costs."

In the second memorandum opinion, it is said:

"The present case falls within exception 2—that of misrepresentation in passing off the article. The furnace in question failed because, through faulty design, it would not heat the house to normal temperature and because its operation caused damage to the rooms and walls.

"Plaintiff's Exhibit 'A' is a circular put out by the Pacific Coast Coal Company to assist in sales. This circular is full of representations such as: 'New heating efficiency,' 'amazing furnace,' 'less fuel,' 'ideal for houses,' 'acceptable to Federal Housing Agencies,' and many others to the general effect that the furnace would be most satisfactory for small houses. Many of these representations were carried into the advertisement of the Allied Home Appliance Company, Plaintiff's Exhibit 'D.' Such circulars are admissible against the manufacturer. *Baxter v. Ford Motor Company,* 168 Wash. 183.

"Since these representations proved untrue and were the cause of damage to plaintiff, the courts will grant relief against the manufacturer. Plaintiff's damage is fixed at $650.00."

The difference in result presumably flows from the change of the court's point of view, indicated in the following quotations from the two opinions. In the first opinion, after finding that the furnace in plaintiff's house did not furnish adequate heat and deposited soot throughout the premises, the court said:

"It is clear that the furnace does not work satisfactorily either through faulty design or through improper installation. *The Court is unable to determine which is the cause.*" (Italics ours.)

In the second opinion, the court, having made the same findings as to the insufficiency of the furnace, went on to say:

"While the Court is not an expert on furnaces, it concludes that the deficiencies above indicated must be [due]

to faulty design. The furnace does not work right for some reason and the Court would not expect any purchaser of a home to be satisfied with its performance."

After denying the post-trial motions, the court signed findings to the effect that the furnace was unsuited for the purposes of heating the premises and did not work satisfactorily, in that it did not furnish sufficient heat, smoked up the rooms, and deposited soot in the premises. As hitherto stated, we cannot say that the evidence preponderates against those findings. But the court went on to find, as follows:

"That the Pacific Coast Coal Company knew, or should have known, of the faulty design and construction of said furnace, and that there was misrepresentation, fraud and deceit in passing off said article, and that said furnace failed, through faulty design, in that it would not heat the house to normal temperature, and its operation caused damages to the rooms, and walls, that plaintiff has sustained damages by reason thereof in the sum of $650.00."

In discussing the principal legal question involved, we will assume, without deciding, that the trial court correctly held that the same rules apply to a distributor as apply to a manufacturer.

The trial court rightly held, in its first memorandum opinion, that, since there was no privity whatever between the plaintiff and any of the defendants, the plaintiff could not recover against any of them on the theory of breach of warranty, express or implied, or any other contractual theory.

But, in our comparatively early decision in *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C, 140, 48 L. R. A. (N.S.) 213, it is pointed out that, where there is no contractual privity, a manufacturer may, under certain states of fact, be held liable in a tort action. In that case, which had to do with poisonous canned meat, the court said:

"It seems that the test should not rest in finding the plaintiff's damage in health or business, but in answering the question whether there has been a damage which may

be justly attributed to the negligence or a breach of duty on the part of the one who had power and whose duty it was to prevent the wrong."

In the recent very comprehensive and useful opinion cited by the trial court in its memorandum decisions (*Bock v. Truck & Tractor, Inc.*, 18 Wn. (2d) 458, 139 P. (2d) 706), an extended quotation is made from Judge Cardozo's opinion in the case of *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, Ann. Cas. 1916C, 440, L. R. A. 1916F, 696. It appears in that case that the plaintiff purchased from a retail dealer a new automobile which had a defective wheel. It collapsed, and he was severely injured. He brought a suit against the manufacturer, with whom he had had no contractual relation. It is said in the opinion:

"There is no claim that the defendant knew of the defect and willfully concealed it. . . . The charge is one, not of fraud, but of negligence. The question to be determined is whether the defendant owed a duty of care and vigilance to any one but the immediate purchaser."

The *Bock* case relies largely upon *Flies v. Fox Bros. Buick Co.*, 196 Wis. 196, 218 N. W. 855, 60 A. L. R. 357, which was plainly a negligence case, and, although there was some consideration of alleged false representations in the *Bock* case, it was in fact decided on the theory of negligence. See paragraph [5] of the opinion in 18 Wn. (2d) at page 475.

No nonprivity case has been cited to us in which an actual recovery has been had against a manufacturer on the ground of fraud, but we think that there can be no doubt whatever that such a suit can be maintained, provided the plaintiff can establish the essential elements of that species of tort. Indeed, we have, in effect, so held in *Baxter v. Ford Motor Co.*, 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521.

While the plaintiff in that case was driving his new Ford car, a pebble flipped by a passing car struck his windshield and shattered it, with the consequence that he lost an eye and was otherwise injured. He brought an action against the manufacturer of the car, with whom he had had no contractual relation. In the trial of the case, he offered in evi-

dence the catalogues of the defendant, representing that the windshields on its cars were nonshatterable, accompanied by an offer of oral testimony that he saw and read that representation in the Ford catalogues, and believed and relied upon it in purchasing the car in which he was injured. This evidence was also excluded, and, there being no contractual privity between the plaintiff and the defendant, the case was taken from the jury by the trial court and judgment rendered for the defendant. On appeal here, it was held that all of this evidence should have been admitted, and the case was remanded for a new trial. This court said, in part:

"Appellant . . . had the right to rely upon the representations made by respondent Ford Motor Company relative to qualities possessed by its products, even though there was no privity of contract between appellant and respondent Ford Motor Company."

It was clearly the opinion of the court that, if the plaintiff in that case could prove, by clear, cogent, and convincing evidence, (1) that the Ford Motor Company issued catalogues representing that the windshields of their cars were nonshatterable; (2) that plaintiff saw and read those representations; (3) that he purchased a car of that make in reliance upon them; and (4) that the windshields of the car shattered upon a slight impact, by which shattering he was injured, he would be entitled to a recovery against the manufacturer on the ground of fraud, although there was a complete lack of contractual privity.

Speaking of the class of cases in which the manufacturer is held liable, although there was no contractual privity, the opinion in the *Bock* case, *supra,* holds that the liability ". . . does not rest upon a contractual obligation, but upon tort for a wrong committed."

The judgment appealed from in this action is founded upon a finding that the plaintiff was, to his damage, defrauded and deceived by the defendant Pacific Coast Coal Company. At the outset, the appellant contends that there was no such charge in the complaint, and no intimation of such a charge was made during the trial, and it, therefore,

had no opportunity whatever to defend itself against it. To this the respondent rejoins that it is a well-established rule in our liberal system of procedure that a litigant is entitled to the benefit of any evidence favorable to him, provided it was admitted without objection, and has challenged the appellant to point out when or where any objection was made to the admission of his exhibit A, the Pacific Coast Coal Company's circular advertising chimney furnaces, which the court held, in its second opinion rendered on February 27, 1945, contained the false representations upon which its finding of fraud and deceit is based.

As tending to support respondent's view, we may note that, to the typewritten recital, included in the statement of facts, of what the trial judge said at the time he overruled the post-trial motions on March 10th, the trial judge added, and initialed in longhand, the following: "Court also said: 'If necessary, the complaint will be deemed amended to conform to the proof.'"

The trial began in November, but was continued until a date in December. On December 20th, the plaintiff rested.

"THE COURT: Has that circular [Exhibit A] been admitted? THE CLERK: I have it marked so here. . . . THE COURT: This exhibit for identification, Exhibit 'A,' which is the circular of the Pacific Coast Coal Company, has this been admitted? THE CLERK: It has been admitted according to my sheet that I have the record of. MR. HAWKINS: It was admitted at the last hearing. THE COURT: I have it down as having been admitted and think it is now. That is all the exhibits, is it?"

The stenographic record of the previous hearing held on November 16th plainly shows that it was not admitted at that hearing. On its production, with the apparent intention of offering it as an exhibit, Mr. Hawkins, attorney for the appellant here, immediately objected. A page of the circular contained elaborate architectural drawings showing just how a chimney furnace is installed in houses, and the theory upon which it operates. It is, as plaintiff's counsel stated, scarcely possible to understand the construction of the furnace without the assistance of these diagrams. When the objection was made, counsel for the plaintiff said:

"Here is a diagram of the whole thing and I wish to use it for the purpose of informing the Court. THE COURT: It is not offered now? MR. ELLIOTT: No, it is not offered in evidence yet. THE COURT: If you want to examine about it, it is identified. MR. ELLIOTT: Q. Now, showing you Plaintiff's Identification 'A,' will you look at these designs and tell me whether or not that is the kind of furnace you have in the house, if you can tell from that. A. (Examining diagram). MR. ELLIOTT: The purpose is to inform the Court how this thing works and what it is."

Apparently, the exhibit was not actually admitted until December 20th, and it is reasonably inferable that no objection was then made because it was thought to have been already admitted, over objection, on November 16th. However that may be, it is clear that it was offered only to assist the witness in testifying and the court in getting an understanding of the design and theory of the furnace, and not for the sake of proving false representations. There was not only no allegation of fraud in the complaint, but there is nothing in the three hundred fifty pages of the trial record which indicates that plaintiff's counsel, or any of the counsel for the three defendants, or even the trial court, supposed that there was any issue of fraud, or that a fraud case was being tried. Nevertheless, we feel that, under our rules and former decisions, the trial court had the right to hold that an issue of fraud was created by the evidence.

The question to be here determined is whether the evidence in the record is sufficient to support the finding that the furnace was of such "faulty design" that the defendant, to use the language adopted by the trial court from the opinion in *Bock v. Truck & Tractor, Inc., supra,* and previous cases, "has been guilty of fraud or deceit in passing off the article." The question calls for the most careful consideration; for its decision may have consequences reaching far beyond the instant case.

Since the evidence is undisputed that the furnace was one of a great number of patented furnaces of identical design, manufactured by the Round Oak Company after the design had been tested and officially approved by the Fed-

eral bureau of standards and by the engineers of the Federal housing authority, it is apparent that to find the appellant guilty of fraud and deceit, on the theory that the furnace was of faulty design, is equivalent to a finding that we are here dealing with a fraud in which the Round Oak Company was a participant, aided and abetted by the Federal bureau of standards and the Federal housing authority. Furthermore, it is reasonably inferable, from detached bits of testimony found in the record, that the fraud (if it was a fraud) was widespread.

There is testimony that distribution of furnaces of that design was not confined to the Pacific coast, but that they were distributed in localities having a far more rigorous winter climate. A great number were sold and installed in Tacoma alone. The brickmason who built the chimney in the Dobbin house, while on the witness stand, incidentally mentioned that he had erected fifty or sixty other chimneys for the installation of this same type of furnace. A carpenter, called by plaintiff as an expert witness—and whose qualifications as such will be considered later in the opinion—speaking of the type of chimney furnace involved, testified: "I have examined pretty close to one hundred of them."

■ Of all civil liabilities, fraud is the most difficult to establish. In the comparatively recent case of *Andrews v. Standard Lbr. Co.*, 2 Wn. (2d) 294, 300, 97 P. (2d) 1062, the court said:

"The first question presented is whether the evidence established facts showing the commission of fraud.

"In *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428, we set out the essential elements of fraud in the following language:

" 'But what is fraud? This court has been reluctant to circumscribe it by definition. *Knutsen v. Alitak Fish Co.*, 176 Wash. 169, 28 P. (2d) 334; *American Savings Bank & Trust Co. v. Bremerton Gas Co.*, 99 Wash. 18, 168 Pac. 775. We have, however, along with all other courts, recognized certain essential elements that enter into its composition. These are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of

its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage. 26 C. J., p. 1062, §§ 6 and 7; *Grant v. Huschke,* 74 Wash. 257, 133 Pac. 447; *Raser v. Moomaw,* 78 Wash. 653, 139 Pac. 622, 51 L. R. A. (N.S.) 707; *Hamilton v. Mihills,* 92 Wash. 675, 159 Pac. 887.' "

■ Furthermore, fraud is never presumed, but must be proved. The reason for this rule is clearly shown in 37 C. J. S. 398, § 94:

"It follows from the rule that fraud will not be presumed that the burden of proving fraud rests on the party who relies on it either for the purpose of attack or defense.

"The rules which impose the burden of proof on one alleging fraud and which deny a presumption of fraud rest on the fact that fraud is regarded as criminal in its essence, and involves moral turpitude at least, while, on the other hand, the presumption is that all men are honest, that individuals deal fairly and honestly, that private transactions are fair and regular, and that participants act in honesty and good faith. The presumption is against the existence of fraud and in favor of innocence, *the presumption against fraud approximating in strength the presumption of innocence of crime."* (Italics ours.)

Plaintiff testified, somewhat hesitatingly, that one of the reasons he bought the house was that, when he examined it, he recognized the furnace as one of the type he had seen highly recommended in an advertisement in a Tacoma paper. This advertisement was introduced in evidence as exhibit D. It is an advertisement of the Allied Home Appliances, under which name Waters and wife carried on business. As heretofore stated, there is a great deal of clear, positive, and undisputed evidence in the record that Waters and his wife were in no sense agents of the Pacific Coast Coal Company, and whatever representations were made in exhibit D were not its representations.

No representations by the Pacific Coast Coal Company are shown in the record other than appear in exhibit A. The trial court says, in its second memorandum opinion:

"Plaintiff's Exhibit 'A' is a circular put out by the Pacific Coast Coal Company to assist in sales. This circular is full of representations such as: 'New heating efficiency,' 'amazing furnace,' 'less fuel,' 'ideal for houses,' 'acceptable to Federal Housing Agencies,' and many others to the general effect that the furnace would be most satisfactory for small houses. . . .

"Since these representations proved untrue and were the cause of damage to plaintiff, the courts will grant relief against the manufacturer. Plaintiff's damage is fixed at $650.00."

■ Of these representations the most important is, "acceptable to Federal Housing Agencies." The evidence that the furnace was acceptable to those agencies is clear and in no way rebutted. For the most part, the other representations relied upon are mere "dealer's praise." But it is unnecessary to further discuss this phase of the matter, for several reasons. We have checked and rechecked the record, and we find the appellant is correct in saying that there is no evidence whatever therein that the plaintiff saw the circular until long after he had purchased the Tucker house. It is, therefore, obvious that no finding of fraud could be predicated on any representation in exhibit A, even if false. Proof of reliance upon a false representation is an indispensable element in a fraud action.

Furthermore, although the trial court relied upon alleged misrepresentations in exhibit A, in its second memorandum opinion handed down on February 27th, its findings of fact, entered on the following March 10th, contain no reference to that exhibit, nor any finding that plaintiff relied upon any express representation. After finding that the furnace did not work satisfactorily in plaintiff's house, the court further found:

"That the Pacific Coast Coal Company knew, or should have known, of the faulty design and construction of said furnace, and that there was misrepresentation, fraud and deceit in passing off said article, and that said furnace failed, through faulty design."

The judgment appealed from is clearly founded upon the theory of faulty design, of which the defendant had knowl-

edge, or should have had knowledge. The trial court's conclusion seems to have been based on the following course of reasoning: The furnace failed to work; there is no proof that it was not properly installed; hence, it must follow that it was of faulty design. That the furnace did not work satisfactorily in plaintiff's house, would be a pivotal finding in the case, as pleaded, but, though pertinent, is only a subsidiary fact when the issue is fraud in design. That is a fact to be proven by clear, cogent, and convincing evidence; and, although, as we have heretofore stated, the evidence was not sufficient to warrant the court in finding that the furnace was improperly installed, there was enough to raise a great doubt as to whether it was or not.

The doubt was interjected by the testimony of the plaintiff, his wife, and his expert witness. Due to the drying of the attic floor boards, there was a crack in the floor through which air was violently sucked. It was claimed that, during the installation, a hole must have been left in the duct lying immediately below it through which air was conveyed in the direction of the furnace, or that the duct had been subsequently broken. As to this, the plaintiff testified as follows:

"Well, when the cold weather started in I thought I should be getting more heat out of it and I went upstairs and I found out one of the ducts had been broken underneath and was sucking the cold air in. . . . Q. I thought you said you had not examined the hole in the duct? A. There is an opening there, there must be. . . . Q. I am asking you what you know; you never even looked at it? A. Did I take the floor up? I have to take the floor up to do it. Q. Did you or did you not look to see if there was any hole in the duct? A. No. Q. You don't know whether there is or not, do you? A. I can use my own judgment, can't I?"

Mrs. Dobbin testified as follows:

"Q. There is no cold air vent in the attic? A. There is something broken underneath there. Q. Have you seen that? A. You can put your hand over there and feel the air that is drawing where that is not supposed to. The service man did come up there and he said that was wrong and

should be fixed. Q. The air draws in there, it does not draw the air out at that particular point you are talking about? A. I can feel the air; it is like a suction. Q. If it is like a suction it is pulling it in there? A. It is blowing in because it is not right."

The plaintiff's expert witness testified as follows:

"A. There was a defect, as I said, that was discernible on the attic floor. I did not tear up the attic floor to see what it was but there must be. Q. There might be a little leak in one of the ducts? A. There is a considerable. Q. Other than that there wasn't anything to amount to anything? A. It would probably amount to operating the entire cold air return, just about that, I would think."

The same witness testified that there was a crack in the furnace dome from which soot could escape. It is not to be supposed that the furnace was designed with holes in the air ducts and cracks in the dome. It seems to us that this line of evidence fully warranted the position taken by the court in its first memorandum decision:

"It is clear that the furnace does not work satisfactorily either through faulty design or through improper installation. *The Court is unable to determine which is the cause.*" (Italics ours.)

Doubtless, there would have been more evidence, both pro and con, as to design had faulty design been pleaded. As it was, whatever evidence the plaintiff produced as to design was merely for the purpose of making it appear probable that an implied warranty of fitness had been breached, and whatever the defendant produced was for the hopeful purpose of supplying a basis for an inference that the plaintiff's claim of inefficiency was probably unfounded.

The chimney furnace involved in this action was invented and patented by M. L. Mueller, a heating engineer who seems to have foreseen the need of a heating unit for small houses which would burn coal and, therefore, save oil, and which would use as little iron as possible and, therefore, conserve metal, the use of both oil and metals being strictly limited by the war production board. Mr. Mueller,

after visiting the Dobbin house and inspecting the furnace, testified, in part, as follows:

"A. Starting in 1941 I went to Washington, D. C. with the chimney furnace design to the Federal Housing Administration and the Federal Public Housing Administration Engineers, Mr. Thulmann and Mr. Asberry, following the rules and regulations of the Government as they existed and they said this had to be put up to the Bureau of Standards and tested. *It was tested back there in the same form as is in Mr. Dobbin's house.* The Bureau of Standards and the mechanical engineers of these two bureaus which form the Federal Housing, or Federal Public Housing and the Federal Housing Administration, decided that would be a mode to heat these houses with a minimum of metal and so put out a ruling. I was there strictly as a heating engineer. Q. This furnace passed their test and was approved by them? A. That is right." (Italics ours.)

Mr. Kerrihard, manager of the heating division of the Pacific Coast Coal Company, testified, in part, as follows:

"Q. These furnaces had been approved by the F.H.A.? A. Oh, yes. Q. Has it been approved by any other government agency? A. Well, all furnaces that are used in government projects must first go through what is known as the Government Bureau of Standards, it is a government test laboratory which approves all equipment that goes into any government buildings, and this furnace went through that laboratory and was there five or six months in the laboratory. Their tests are not available to the general public but are available to anybody who wants to write. Q. Was it approved by the Bureau of Standards? A. That is right. Q. And has been approved by the F.H.A. and installed in F.H.A. houses? A. Yes."

The evidence given by Mueller and Kerrihard, as quoted above, was not rebutted. Assuming, *arguendo,* that the design of the furnace was in fact faulty, as held by the trial court, it seems very difficult to find that the appellant knew, or should have known, that fact, under those circumstances.

In 23 Am. Jur. 761, § 11, in making a distinction between fraud and negligence, it is said: "Fraud is a malfeasance, a positive act resulting from a wilful intent to deceive."

In our own decisions in *Webster v. Romano Engineering Corp.,* 178 Wash. 118, 34 P. (2d) 428, and *Andrews v.*

*Standard Lbr. Co., supra,* it is held that, in order to establish fraud by false representations, the plaintiff must show "the speaker's knowledge of its falsity or ignorance of its truth." Here, the Pacific Coast Coal Company, a distributor, relied upon, and would seem to have had the right to rely upon, the assurance of the manufacturer, the decision of the United States bureau of standards, and the engineers of the Federal housing authority.

We find it unnecessary, however, to prolong the opinion by a discussion of this feature of the case; for in our opinion, the finding of faulty design is not supported by evidence that is clear, cogent, and convincing, or by a preponderance thereof. The trial court's finding of faulty design must be founded wholly upon the testimony of plaintiff's expert witness; for, with the exception of Mueller and Kerrihard, no other witness in the case touched upon that subject. As to his qualifications as an expert, the witness testified, in part, as follows:

"Q. You are in what business? A. I am a journeyman carpenter and occasionally contract. . . . Q. How long have you been a carpenter? A. Well, I have worked at carpenter work since I was a boy."

When he began to testify about furnaces and the theory of heating appliances, the following occurred:

"MR. ELLIOTT: Q. Mr. Johnson says your testimony has been wholly that of a journeyman carpenter heretofore. Now, will you tell the Court what your qualifications are in general as to your knowledge of heating apparatus, the engineering feature to it and combustion and what you know in general about that? They say you are a journeyman carpenter, if you know how to testify about a heating plant will you tell the Court what your experience has been with reference to combustion and heating, and so forth? A. In the first place, I have had ordinary high school education in physics and chemistry. I did not acquire all of my knowledge in physics and chemistry from an ordinary high school education. Q. How did you get that? A. At the time I was working for the Spencer Heating Company there were various technical problems there and it was desirable that I investigate those problems and that I go over the best authorities of the time and read and study and absorb the

written and public results of their experience and observation and it was also necessary to make experiments. It was also necessary to prove and disprove theories and to formulate certain desirable objectives in the construction of heating plants and to stick to and realize those objectives. Now, that is scientific and technical work and even beyond that experimental work it was necessary to install these units and see the practical results of the theoretical applications."

After he had elaborated a little further on that experience, the court ruled that he was qualified; but counsel for one of the defendants asked for leave to inquire further, and, leave being granted, he was interrogated as follows:

"Q. I believe you testified on direct examination that you worked for the Spencer people. How long ago was that? A. Oh, that was about 1909, 1910 and 1911. Q. That is thirty-three years ago? A. Yes. Q. And you spent how much time with the Spencer Furnace Company? A. Well, more than two years with my intense work. Q. You were how old at that time? A. I was just in my 20's, probably 21. Q. You haven't followed the heater work since that time, have you? A. Yes, I have been more than a little interested in it. Q. Where have you worked for any heating company since 1910 or 1911? A. Well, I haven't worked for any heating company. Q. You haven't worked for any heating company, have you? Have you worked for any furnace company since then? A. No. Q. Have you worked for any company who installed heaters or furnaces? A. Not particularly, generally by a sub-contract. Q. Well, as a matter of fact, you worked as a carpenter on that contract, didn't you? A. Yes. Q. You did not work as a heating man on those sub-contracts? A. No, but in some cases I had the responsibility to see they were installed. Q. You did not take these sub-contracts for heating, installing heating, did you? A. That is true. Q. What you did was to do the carpenter work where you were told to make a hole or a vent or told to prepare the basement for the base of the furnace or something of that character, that was a part of your contract, wasn't it? A. Yes. Q. But the actual installation of the furnace was not a part of your work? A. That was generally left to somebody else. Q. Left to somebody who had knowledge of it? A. I am sorry to say, not always."

He further testified that he had first come in contact with the chimney furnace in Tacoma, in the fall of 1940. There

is testimony in the record that it had not been invented at that time, and that no such furnace was installed in Tacoma until June or July, 1942. He claimed to be familiar with four or five types of chimney furnaces, although there is quite convincing testimony that, even at the time of the trial, there was no chimney furnace in existence other than the Mueller patented furnace with which this case is concerned:

"Q. You said there are four or five others, tell me what others? A. I haven't seen any of them lately. Q. There never was, was there? A. That does not make any difference to me, I would not say that. Q. Was there or wasn't there? A. I said I had not seen any lately."

He was extremely evasive in answering questions concerning the theory underlying the design of the furnace:

"Q. What is the difference between this and any other hot air furnace? A. I could resolve it all down in a very few words. Q. Go ahead and resolve it. A. The answer is in few words in the case of this particular furnace, that other furnaces work and this one does not. Q. That is not what I am asking you, Mr. Peck. I am asking you what is the difference in the theory? A. That is the difference in the theory, one particular type of furnace does not work and other types do work. Q. According to your statement the chimney furnace of this type and make did not work? A. I would not say that, I would qualify it and say that this one does not work. I am not interested in any other chimney furnace right now."

The court ruled that, since the witness was a builder, he was qualified to testify, but added: "The weight of his testimony is for the court." The trial court was, of course, in a much better position than we are to assess his testimony as to credibility, but we are in nearly as good a position to appraise its content and probative force. He repeatedly stated the conclusion that the design of the furnace was not scientifically sound, but gave no better reason than that this furnace and one other, which he believed, but was not sure, was of the same type, did not work. We do not regard his testimony as clear, cogent, and convincing, and there is reason to think the trial judge did not; for, in ruling on

the post-trial motions just prior to entering the findings and judgment, he said:

"I do not know much about furnaces, but it seems to me that a furnace with the kind of upside down arrangement, the way it was built it would not take care of the smoke as well as another. I cannot be sure about that, I do not know enough about furnaces, but it didn't work right."

We quote a portion of a quotation made, with approval, in a recent case (*Meyer v. Young*, 23 Wn. (2d) 109, 159 P. (2d) 908):

" 'Fraud must be proved. It isn't that the Court can think there is probable fraud or there is a preponderance of evidence of fraud. That is not enough. . . . The Court must be satisfied by evidence clear, cogent and convincing that fraud occurred.' "

[See, also, the first sixteen Washington decisions to this effect cited in 6 Washington Digest 289, under Fraud, Evidence (C), Key No. 58, "Weight and Sufficiency," and the subsequent decisions cited in the 1946 Cumulative Supplement under Key No. 58.]

 Furthermore, and finally, we are of the opinion that the approval of the design of the furnace by the United States bureau of standards and the engineers of the Federal housing authority is entitled to more weight than the disapproval of the plaintiff's expert witness.

The judgment appealed from is reversed, and the cause dismissed.

BEALS, C. J., BLAKE, and JEFFERS, JJ., concur.