CALCEDONIO GIARRATANA AND MABEL GIARRATANA, HUSBAND AND WIFE, PLAINTIFFS AND RESPONDENTS, *v.* MARTIN T. NADDY, A SINGLE MAN, K. HUNTER AND E. J. KINZLER, CO-PARTNERS, D/B/A OHIO OIL SYNDICATE, A CO-PARTNERSHIP, J. F. MISKIMEN AND HELEN MISKIMEN, HIS WIFE, ETC., DEFENDANTS AND APPELLANTS.

No. 9375.

Submitted March 11, 1955. Decided May 31, 1955.

284 Pac. (2d) 254.

H. B. Landoe, Bozeman, for appellants.

Milton G. Anderson, Sidney, D. C. Warren, Glendive, for respondents.

Mr. Anderson argued orally.

MR. JUSTICE ANGSTMAN:

Plaintiffs brought this action to quiet title to certain described real estate situated in Dawson County, comprising 2,880 acres. The defendants filed an answer in which they admit the plaintiffs are the owners of the land in question, but allege that they gave to the Ohio Oil Syndicate, one . of the defendants named, a certain oil and gas lease, which was duly recorded. They allege that the Ohio Oil Syndicate is a co-partnership consisting of defendants K. Hunter and E. J. Kinzler as co-partners. The answer denies that the defendants Naddy and J. F. Miskimen and his wife, Helen Miskimen, have any claim or interest in or to the property, and hence hereafter when referring to defendants we will be referring to all defendants save the Miskimens and Naddy. The answer alleges that the defendants have complied with the terms, conditions and covenants of the oil and gas lease, including the payment or tender of payment of oil delay rentals. Their prayer is that judgment be entered that the oil and gas lease be declared to be a valid, binding lease upon the lands described in the complaint.

The reply admits the execution of the lease but denies its validity. It admits that defendants Hunter and Kinzler are a co-partnership doing business under the name Ohio Oil Syndicate. It alleges that the lease in question was executed as a result of fradulent representations to the effect that the defendants would drill a well on or before May 11, 1952; that the defendant co-partnership, through its agent Naddy, was given the form of a lease which plaintiffs desired to have executed, and that he without the consent of the plaintiffs caused the lease to be drafted entirely different in form and contents, and that plaintiffs, relying upon the representations and having

156

faith and confidence in the agent, signed the lease relying upon the fraudulent representation that the lease would be in the form which was submitted to him, and that the plaintiffs were thereby deceived and damaged.

The reply further alleges that the lease was executed without any monetary consideration received by plaintiffs. It further alleges that the defendants failed to commence the drilling operations prior to May 11, 1952, or at all, and by reason of their failure so to do the lease became null and void and of no effect.

Their reply further alleges that the plaintiffs have refused to accept or receive any delay rental after May 11, 1952; that they notified Naddy as the agent of the other defendants that the oil and gas lease was terminated and void; that the same constitutes a cloud against the plaintiffs' title to the lands, which they desire to have removed from the records of Dawson County.

The cause was tried to the court without a jury. Judgment went in favor of the plaintiffs and defendants have appealed.

The court found that the association between the plaintiffs and the defendant Naddy built up a relationship whereby the plaintiffs placed implicit reliance and confidence upon him; that the oil and gas lease was executed under the following fraudulent representations:

First, that the lease was obtained by Naddy under the representation that oil drilling operations would be commenced on the land on or before May 11, 1952, and that this promise or agreement induced plaintiffs to sign the lease without the payment of any bonus money;

Second, that the defendant Naddy, as the agent for the other defendants, was given the form of lease as modified by plaintiffs and which plaintiffs desired to have executed, which provided for the drilling or the commencement of the drilling ing of an oil well on or before May 11, 1952, and for the forfeiture of the lease if a well were not commenced within that time; that the lease was to be drafted in accordance with the terms set forth in the lease form delivered to Mr. Naddy by

plaintiffs; that without the consent of the plaintiffs and without their presence Mr. Naddy caused the lease to be drafted entirely different in form and contents and contrary to what the plaintiffs desired and demanded to have incorporated in the lease; that plaintiffs in reliance upon the faith and confidence of Naddy and his representations signed the lease; that the plaintiffs' signatures to the lease were procured because of Mr. Naddy's fraudulent representation that defendants would commence the drilling of a well on or before the 11th day of May 1952; that by virtue of this promise to commence the drilling operations plaintiffs agreed to waive any cash payment or any cash consideration for the execution and delivery of the lease; that the fraudulent representations made by Naddy were known by him to be false at the time they were made to the plaintiffs, and they were made for the purpose of deception and that they thereby procured the signatures of plaintiffs to the lease; that plaintiffs accepted the representations as true and were deceived and damaged thereby.

The court concluded that the plaintiffs are now the owners of the land free and clear of any claim by reason of the execution of the purported oil and gas lease, which the court found to be utterly void and invalid and of no effect whatsoever. The court found also that the defendants have no interest in the land by reason of the lease, and that plaintiffs are entitled to judgment expunging the lease from the records as being void and of no effect.

The record reveals that plaintiffs were Italians who came to this country at the conclusion of World War I and settled about 15 miles southeast of Glendive on the land in question here. Both had become American citizens. Neither of them had the benefit of much schooling. It appears that Mable had a third grade education in Italy, but her husband had practically no schooling. When the oil boom started in eastern Montana, they received various offers to enter into oil and gas leases. They had an offer of $2.75 per acre bonus from the Shell Oil Company but this they refused and rejected because the oil

158

company would not promise any oil drilling but wanted a ten-year lease where drilling could be deferred from year to year by the payment of delay rental. Plaintiffs did not want that sort of a lease and were willing to forego bonuses if they could get the land drilled. They entertained the notion that their land was underlaid with oil and they wanted it drilled out during their lifetime. At the time of the trial the husband was about 63 years of age while the wife was about 56. When Naddy first met plaintiffs he evinced an interest in uranium. He cultivated the acquaintance of plaintiffs by making several visits to their ranch ostensibly in search of uranium. According to plaintiffs' testimony he finally sought an oil and gas lease and offered to do the necessary drilling within one year if a lease would be executed to him. The plaintiffs were assured that if no drilling were commenced within one year after the execution of the lease, the lease would terminate. Mr. Naddy delivered to plaintiff a form lease the night before it was actually signed, and Mrs. Giarratana, by the use of a dictionary, worked it over during the night and made such changes in it as she thought necessary so as to have it provide definitely that the drilling should be done within one year's time or the lease would be forfeited. The following day they went to the office of a friend of plaintiffs', Mrs. A. J. McCarty, to have the lease typewritten. Mrs. Giarratana handed to Mrs. McCarty the copy of the lease which she had worked over and asked her to copy it on the typewriter. Naddy picked up the copy and supervised the preparation of the final lease by telling Mrs. McCarty what to incorporate in the lease. Mrs. McCarty thought he was giving her the information to put on the final lease from the copy which had been delivered to her by Mrs. Giarratana. Mrs. McCarty knew of the fact that they had been offered a bonus of $2.75 per acre, and asked why they were rejecting such an offer. Mrs. Giarratana replied they were interested in obtaining a drilling contract and not a ten-year lease, regardless of the bonus, and assured Mrs. McCarty that Naddy was going to drill within a year. She told Mrs. McCarty that what they

desired was to have drilling operations within the year, and if not that the lease should be forfeited at the end of the year.

The record justifies the findings and conclusions reached by ██ ██ the trial court with respect to fraud. We can do no better than to allude to the authorities referred to by and the trial judge in his findings of fact and conclusions of law wherein reference was made to the case of Hale v. Hale, 62 W.Va. 609, 59 S.E. 1056, 1058, 14 L.R.A., N.S., 221, where the court said: "A court of equity is a court of conscience and will not tolerate unfairness, inequitable conduct, or corruption * * * however strong and clear his equitable right against the other party. * * * There is a vast difference, too, between the status of one who has received nothing for that with which he has parted, and as to whom the transaction was wholly fradulent, and that of a man who has made a contract by which he has not only parted with something, but received something in exchange, and in which the fraud operated only partially, reaching the substance to be sure, but not constituting the basis of the entire transaction."

And to the case of Knutsen v. Alitak Fish Co., 176 Wash. 169, 28 Pac. (2d) 334, 337, where the court quoted with approval from the case of American Savings Bank & Trust Co. v. Bremerton Gas Co., 99 Wash. 18, 168 Pac. 775, as follows: " 'Fraud is a thing to be described, rather than defined. Deception may find expression in such a variety of ways that most courts have studiously avoided reducing its elements to accurate definition. Human foresight is not sufficiently acute to anticipate the secret and covert methods of the artful and designing of those who endeavor to reap where they have not sown. Once let it be known what the courts consider fraudulent and those engaged in its perpetration will busy themselves in inventing some means of evasion. The courts therefore should content themselves with determining from the facts of each case whether fraud does or does not exist. While fraud is not lightly to be inferred, it does not follow that the inference of fraud cannot be gathered from surrounding circumstances, provided they

are of sufficient strength and cogency to overcome the presumption of honesty and fair dealing.' "

And to the same general effect are Eckert v. Miller, 57 Ariz. ██ ██ 94, 111 Pac. (2d) 60, and McGinn v. Tobey, 62 Mich. 252, 28 N.W. 818, 4 Am. St. Rep. 848. As before stated, we find ample evidence in the record to sustain the trial court's findings and judgment with respect to fraud. True, some of that evidence was denied by evidence offered on behalf of defendants, but these conflicts were resolved by the trier of the facts. We are not at liberty to substitute our judgment for that of the trial judge where, as here, there is ample evidence supporting the findings. Finding no reversible error in the record, the judgment is affirmed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES ANDERSON, DAVIS and BOTTOMLY, concur.